1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9

10 STEVEN FLOYD, on behalf of himself and all others similarly situated,

                Plaintiff,

v.

AMAZON.COM, INC., a Delaware corporation, and APPLE INC., a California corporation,

                Defendants.

Case No. _____

**CLASS ACTION COMPLAINT**

**<u>DEMAND FOR JURY TRIAL</u>**

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION .............................................................................1

II. JURISDICTION AND VENUE ......................................................7

III. PARTIES .........................................................................................8

IV. RELEVANT FACTS ........................................................................8

    A.  Apple's Dual Distribution Scheme – A Strategy of Scarcity .................8

    B.  Amazon's Dual Roles – A Marketplace and a Retailer ........................10

    C.  Apple and Amazon Compete With Each Other and Third-Party Merchants...........................................................................13

    D.  There Was Active Marketplace Competition in the Sale of Apple Products Before the Unlawful Boycott Agreement. ...............................14

    E.  By Agreement, Amazon and Apple Excluded Nearly All Third-Party Merchants that Sell Apple Products on Amazon's Platform and Eliminated the Competitive Threat They Posed. ...........................16

    F.  The Unlawful Boycott Agreement Has Had Substantial Anticompetitive Effects. ....................................................19

        1.  Consumers Were Harmed. .........................................................19

        2.  Third-Party Merchants Were Harmed. ......................................22

        3.  The Unlawful Boycott Agreement Reduced Output...................23

    G.  Both Amazon and Apple Secured Anticompetitive Benefits from the Unlawful Boycott Agreement. ..................................................23

    H.  There is No Procompetitive Justification for the Unlawful Boycott Agreement, Much Less One Unattainable Through Less Restrictive Means. ...................................................................24

V.  RELEVANT MARKET....................................................................25

    A.  There is a Relevant Antitrust Market for Online Consumer Electronics Marketplaces. ...................................................25

        a.  Single-Merchant Online Stores Are Not Reasonable Substitutes. ................................................................26

CLASS ACTION COMPLAINT - i
Case No.
011121-11/2070390 V1


1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

             b.     Brick-and-Mortar Stores Are Not Reasonable Substitutes ....................................................30

B.     The Relevant Geographic Market is the U.S. ........................................................31

C.     Amazon Has Substantial Market Power in the Market for U.S. Online Consumer Electronics Marketplaces.........................................32

D.     Amazon Would Have Market Power in a Broader Online Electronics Retail Market. ..............................................35

VI.     INTERSTATE TRADE AND COMMERCE ....................................................35

VII.    CLASS ALLEGATIONS ..........................................................................35

VIII.   ANTITRUST INJURY AND STANDING ......................................................38

IX.     CLAIM FOR RELIEF ...............................................................................38



Plaintiff Steven Floyd alleges the following upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon the investigation made by and through his attorneys and experts in the field of antitrust economics:

## I.    INTRODUCTION

1.      Amazon operates the digital platform, Amazon Marketplace.  Amazon Marketplace is the world's largest online marketplace, where Amazon sells millions of goods as a retailer and also hosts more than 2.3 million third-party merchants, with whom it competes as a retailer in the sale of the same or similar goods on its own platform.  Amazon is the largest online seller of electronics, with 82% of the market.[1] In addition to hosting other third-party sellers, Amazon also sells Apple products (and other consumer electronics) on its own marketplace in its capacity as a retailer. Apple is the world's largest technology company, specializing in the manufacture and sale of consumer electronics. Apple sells its products directly to consumers on its own online store and indirectly through third-party distributors, including Amazon.  Direct sales to consumers is a major part of Apple's business; Apple is the third largest online retailer in the United States.[2]

2.      In their capacities as online electronics retailers, Amazon and Apple are horizontal competitors, who compete for many of the same online customers in the sale of Apple's own products and the sale of consumer electronics generally.  Both Amazon and Apple have an economic incentive to sell as many Apple products as possible, and they compete to win ecommerce sales.

3.      Amazon and Apple compete not only against each other for retail customers, but also against the third-party merchants that sell consumer electronics, including Apple products, on Amazon Marketplace.  Whenever a third-party merchant sells an iPhone on the Amazon Marketplace, that is an iPhone sale that neither Amazon (as a retailer) nor Apple (as a direct

---

[1] 2019 Jumpshot report, Losers Brands and Retailers Who Couldn't Make It Happen in 2018 at 21.

[2] Stephanie Chevalier, *Market share of leading retail e-commerce companies in the United States as of June 2022,* Statista (Aug. 26, 2022), https://www.statista.com/statistics/274255/market-share-of-the-leading-retailers-in-us-e-commerce/ (last visited Nov. 8, 2022).

HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

seller) will make.  Vigorous competition from the third-party merchants exerts downward pressure on the online prices that both Apple and Amazon can charge for Apple products.

4.       This case concerns an unlawful horizontal agreement between Apple and Amazon to eliminate or at least severely reduce the competitive threat posed by third-party merchants. The agreement is a naked restraint and *per se* unlawful under the Sherman Act.

5.       Historically, there were never limits on the number of Apple resellers operating on Amazon's marketplace.[3]  Amazon was one of those resellers, but there were hundreds of others.  The ranks grew substantially in 2017, prompting active price competition.  By the outset of 2018, at least 600 third-party Apple resellers were active on the platform.  And prices were falling as a result, with third-party merchants offering steep discounts—sometimes exceeding 20 percent—off the prices Apple charged on its own online store.

6.       This posed a problem for both Apple and Amazon.  Apple has a history of maintaining high market prices for its products by withholding supplies from resellers that would otherwise undercut Apple's own retail prices.[4]  Active price competition on Amazon Marketplace threatened to destabilize the high prices Apple seeks to sustain in its own stores. This was also a problem for Amazon.  Displeased with active price competition on Amazon Marketplace, Apple refused to authorize Amazon to sell Apple's most popular products.  This forced Amazon to purchase Apple products from other sources and raised its acquisition costs.[5] As a retailer, Amazon's own share of the sale of Apple products on Amazon Marketplace was virtually non-existent.

7.       Unable to overcome these challenges unilaterally, the two online giants—Apple and Amazon—decided in 2018 to address them collectively.  They did so through a horizontal agreement that eliminated nearly all Apple resellers on Amazon Marketplace—their horizontal

---

[3] The Complaint refers to sellers of Apple products on Amazon's platform as "third-party merchants" when describing them from the perspective of Amazon Marketplace and as "Apple resellers," when describing them from the perspective of Apple's distribution chain.

[4] *See infra*, Sec. IV.A.

[5] Autorita' Garante della Concorrenza e del Mercato (AGCM) Nov. 16, 2021 decision, ¶ 76 ("AGCM Decision"), https://www.agcm.it/dotcmsdoc/allegati-news/I842%20chiusura.pdf (last visited Nov. 8, 2022).

CLASS ACTION COMPLAINT - 2
Case No.
011121-11/2070390 V1



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

competitors.  In exchange for eliminating the Apple resellers that were driving down online prices for Apple products, Apple agreed to provide Amazon consistent supplies at a discount of up to 10%--contingent on its ability to keep the excluded sellers off Amazon Marketplace.[6]  This was accomplished by the Global Tenets Agreement, dated October 31, 2018, and made effective January 1, 2019 (hereinafter the "Unlawful Boycott Agreement").  The Unlawful Boycott Agreement, the existence of which neither Amazon nor Apple can dispute, authorized Apple to place a quantitative limit on the number of Apple resellers operating on Amazon Marketplace, and as consideration for Amazon's consequent exclusion of hundreds of third-party merchants that sell Apple goods from its marketplace, Apple guaranteed a steady supply of Apple goods to Amazon (in its capacity as a retailer) at discounted wholesale prices.  Pursuant to the Unlawful Boycott Agreement, Apple authorized just seven Apple resellers to sell on Amazon Marketplace in the United States.  The remaining resellers (at least 600) had their Apple products removed from the platform by Amazon.

8.     The Unlawful Boycott Agreement transformed Amazon's near-zero share of Apple iPhone and iPad sales on Amazon Marketplace to its current dominant position as depicted below—identifying the percentage of days in a month in which Amazon won the buy box for sales of Apple iPhones and iPads—which shows Amazon's domination in sales after the agreement was reached:[7]

---

[6] *Id.* ¶¶ 76, 195, 197.

[7] As discussed in Section IV.B, Amazon Marketplace employs an algorithm to select the offer to occupy the "buy box," or one-click purchase offer that 90% of consumers rely on when they buy on Amazon Marketplace.  Thus, competition for the buy box is the primary way that merchants, including Amazon, compete with each other on Amazon Marketplace.

CLASS ACTION COMPLAINT - 3
Case No.
011121-11/2070390 V1





9.     The win for Amazon was a loss to consumers.  With virtually all other Apple resellers eliminated from the platform, price competition deteriorated almost immediately.  The steep discounts on Apple products that consumers once enjoyed on Amazon Marketplace eroded, with prices rising steadily.  The connection—between the decrease in sellers and increase in prices—is manifest in pricing data for iPhones and iPads, Apple's flagship products:



Apple Product Universe
Number of Sellers vs. Average List Price Percentage

10.     Overall, the data indicate that Amazon Marketplace prices on iPhones and iPads increased by more than 10 percent following, and resulting from, the Unlawful Boycott Agreement.  Single damages to Plaintiff and the proposed Class are substantial.

11.     The merchants removed from the platform were likewise harmed.  Amazon operates as the gatekeeper to the online retail market.[8]  For many third-party merchants, Amazon Marketplace is the only viable channel for reaching consumers.[9]  Excluded from the platform by virtue of the Unlawful Boycott Agreement, many merchants had nowhere to turn and could not and cannot compete in the market.  As one congressional body has concluded, online merchants "who try to diversify sales across multiple platforms often report that they are unable to generate many sales outside of Amazon."[10]

---

[8] Subcommittee on Antitrust, Commercial, and Administrative Law of the Committee on the Judiciary, 116th Cong., Investigation of Competition in Digital Markets, Majority Staff Report and Recommendations ("House Report") at 256 (2020), https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf?utm_campaign=4493-519 (last visited Nov. 8, 2022).

[9] *See* AGCM Decision, ¶¶ 131-32 (finding that in Italy the Boycott agreement reduced online sales of some former third-party sellers by as much as 95%).

[10] House Report at 258.



12.    At the expense of consumers, merchants, and competition as a whole, Amazon and Apple—who are horizontal competitors—profited handsomely from the Unlawful Boycott Agreement.  With limited residual competition from third-party merchants that sell Apple products on Amazon's platform (and by securing a steady, discounted supply of Apple products), Amazon transformed its position on Amazon Marketplace from a peripheral seller of Apple iPhones and iPads to the platform's dominant seller, all while charging higher prices than consumers had previously enjoyed before the Unlawful Boycott Agreement.  For Apple, the higher prices on Amazon's platform meant that fewer of its customers defected to Amazon Marketplace, which stabilized the prices Apple could sustain on its own distribution channel.  In purpose and effect, Amazon and Apple cut out the third-party merchants and divided the spoils.

13.    This case is thus not about Apple independently selecting its trading partners or Amazon independently enforcing its own platform rules.  It is about two horizontal competitors agreeing to eliminate the competitive threat posed by hundreds of other horizontal competitors. Erecting barriers to entry to keep competitors out and raising prices in the wake of their elimination is precisely the kind of conduct that Congress enacted antitrust laws to prevent and cannot be justified on procompetitive grounds.  This collusive agreement is what economists call a "group boycott" or "concerted refusal to deal."  These arrangements have longed been deemed *per se* unlawful under the Sherman Act.  The litigated question typically involves whether the boycott agreement was in fact struck, or at least inferable from the circumstances.  Here, there is no mystery.  Amazon admitted to Congress that it entered an agreement with Apple that permits only "seven resellers of new Apple products" on its platform.[11]  The case is open and shut.

14.    The Unlawful Boycott Agreement can likewise not survive scrutiny under the "rule of reason," were that standard applied.  As set forth in this Complaint, there is a relevant U.S. market for Online Consumer Electronics Marketplaces.  Amazon dominates this market

---

[11] *See* Amazon Responses to Questions for the Record following the July 16, 2019 Hearing of the Subcommittee on Antitrust, Commercial, and Administrative Law, Committee on the Judiciary, Entitled "Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship" (October 11, 2019) ("Amazon's Congressional Responses"), at Response to Question 94, https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-20190716-SD038.pdf (last visited Nov. 8, 2022).



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

with an 82% share of the online retail electronics market and as much as 90% of the online retail marketplace sales.[12]  The Unlawful Boycott Agreement causes severe anticompetitive effects in this relevant market, and it cannot be justified as serving any procompetitive end.

15.     The Unlawful Boycott Agreement is thus unlawful under any applicable standard. It should be enjoined and Plaintiff, and the class Plaintiff seeks to represent, should be awarded damages and all other relief needed to make them whole.

## II.     JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 15 U.S.C. § 15(a) and § 26 because Plaintiff alleges violations of federal law, namely, the Sherman Act and Clayton Antitrust Act.

17.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Amazon, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

18.     This Court has personal jurisdiction over the Defendant Amazon, which is headquartered in this District, does business in Washington, directly or through agents, and has registered with the Washington Secretary of State, such that it has sufficient minimum contacts with Washington.

19.     This Court has personal jurisdiction over both Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants have each acted within one or more judicial districts of the United States and because they have sufficiently caused foreseeable consequences in this country.  Through its substantial business operations in this District, this State, and throughout the country, Amazon has engaged in sufficient minimum contacts with the forum, and it has intentionally availed itself of the laws of the United States.  This Court has personal jurisdiction over the Defendant Apple because Apple has engaged in substantial business

---

[12] 2019 Jumpshot report; *Amazon Marketplace is 25% of US E-commerce*, Marketplace Pulse (Feb. 1, 2022), https://www.marketplacepulse.com/articles/amazon-marketplace-is-25-of-us-e-commerce (last visited Nov. 8, 2022).

CLASS ACTION COMPLAINT - 7
Case No.
011121-11/2070390 V1



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

operations throughout the United States.  Apple is incorporated in California and headquartered in Cupertino, California, and it sells its products directly to its retail customers throughout the United States through physical stores in nearly every state and through its online store as well as indirectly through hundreds of Apple resellers.[13]

20.     This judicial district is a proper venue pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Amazon resides in this District and transacts affairs in this District.  A substantial part of the events giving rise to Plaintiff's claims occurred in this District.  There is also a venue provision, specifying this judicial district under the terms of use for all Amazon customers.[14]

### III.     PARTIES

21.     Plaintiff Steven Floyd is a resident of Williamsport, Pennsylvania.

22.     On February 26, 2021, Mr. Floyd purchased a new Apple iPad from the buy box on Amazon Marketplace for $319.99.  Amazon was the seller of record.  As a result of the Unlawful Boycott Agreement, Plaintiff was denied purchasing on Amazon Marketplace at a lower price which would have been the case in a normal competitive market.

23.     Defendant Amazon is a corporation organized and existing under the laws of Delaware, with its principal place of business in Seattle, Washington.  Amazon is the world's largest online retailer and operates the world's largest online retail marketplace.

24.     Defendant Apple designs, manufactures, and sells iPhones and iPads, as well as other personal computers and smart watches, and its sells a variety of related peripheral products and services, which it sells throughout the United States.  Apple maintains its headquarters and principal place of business in Cupertino, California.

### IV.     RELEVANT FACTS

#### A.     Apple's Dual Distribution Scheme – A Strategy of Scarcity

25.     Apple distributes its products through two channels.  First, Apple maintains its own retails stores, including an online store and physical outlets.  This is Apple's direct

---

[13] *See* https://www.apple.com/retail/storelist/ (last visited Nov. 8, 2022).
[14] Conditions of Use - Amazon Customer Service, https://www.amazon.com/gp/help/customer/display.html%3FnodeId%3DGLSBYFE9MGKKQXXM



distribution channel.  Second, Apple distributes its products through a network of third-party distributors and resellers.  To become an official Apple reseller (hereafter "Authorized Reseller"), retailers must enter into an Authorized Reseller Agreement with Apple.  Authorized Resellers are offered discounts and rebates in exchange for their adherence to certain Apple terms and conditions governing the resale of Apple products.[15]  Apple reportedly has Authorized Reseller Agreements with Best Buy, Target, Staples, AT&T, and others.[16]

26.    Other Apple resellers purchase their supplies from wholesalers or other intermediaries in the chain of distribution.  Unauthorized Apple resellers are not proscribed or illicit.  While these resellers do not receive the discounts and rebates afforded Authorized Retailers, they are generally permitted to distribute Apple products through any retail channel available to them (putting aside the Unlawful Boycott Agreement at issue).

27.    While Apple benefits from its network of third-party distributors and resellers, who provide greater exposure for Apple's products, Apple's own profit margins are higher when it sells directly to consumers.  Apple is thus incentivized to try to maintain a roster of Apple resellers to increase its products' exposure and product reach while constraining these merchants' sales to prevent consumers from defecting from Apple's own stores.  Apple has a track record of doing just this.

28.    Most recently, in 2020 Apple was fined €1.1 billion by the French competition authority for artificially restricting the distribution of its products through its two French wholesalers, including by dictating (and limiting) downstream distribution to retailers and fixing the retail prices at which Apple products could be sold.[17]  Upholding a reduced fine of €372 million, the Court of Appeals of Paris concluded (based on its review of internal correspondence and the investigatory file) that Apple has "adopted a strategy of scarcity" such that "while

---

[15] *See* AGCM Decision at ¶ 26.  The AGCM Decision was annulled on procedural grounds, without any criticism of the agency's factual or economic findings.  The AGCM's decision references and describes many primary source materials—including internal Apple and Amazon documents—and, where appropriate, this Complaint refers to the decision for that purpose.

[16] *See* https://appleinsider.com/deals/apple-authorized-resellers (last visited Nov. 8, 2022).

[17] *See* David McGabe, *France Fines Apple $1.2 Billion for Antitrust Issues*, New York Times (Mar. 16, 2020), https://www.nytimes.com/2020/03/16/technology/france-apple-antitrust-fine.html (last visited Nov. 8, 2022).

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

retailers received only limited quantities of constrained products from wholesalers, the Apple Store or Apple Online Store benefited from a large availability of these same products." [18]  By restricting third-party supply, Apple prevented resellers from competing with Apple's own direct sales to consumers.[19]

29.     As set forth below, this case involves another iteration of the same overarching strategy of scarcity.  The difference here is that Apple achieved scarcity not with conditions imposed on its wholesalers, but rather by entering a horizontal agreement with competitor and retail giant Amazon that outright eliminated virtually all other competitors from the world's largest marketplace.

**B.      Amazon's Dual Roles – A Marketplace and a Retailer**

30.     Amazon runs the largest online retail marketplace and the most visited ecommerce website in the world.[20]  The platform allows third-party merchants to list and sell products of all sorts, including consumer electronics.  More than 2 million merchants list their goods on the platform,[21] and more than 200 million consumers shop on Amazon's marketplace every month.[22]  At least 60 percent of all online product searches in the U.S. begin on Amazon.com.[23]

31.     As a marketplace operator, Amazon charges third-party merchants listing fees (either a flat monthly fee of $39.99 or $0.99 per sale), as well as referral fees.[24]  Amazon also sells merchants shipping and logistics services through its "Fulfillment by Amazon" ("FBA") program.[25]  As a practical matter, paying for FBA "is functionally the only way for sellers to get

---

[18] Cour d'appel [CA] [regional court of appeal] Paris, 7, Oct. 6, 2022, 20/08582 ("Court of Appeals Paris Decision") ¶¶ 286, 294.

[19] *Id*. at 600.

[20] House Report at 255.

[21] House Report at 249.

[22] Jillian Hufford, Amazon Statistics: Need To Know Numbers about Amazon [Infographic], NCHANNEL Blog (Feb. 20, 2020), https://www.nchannel.com/blog/amazon-statistics/ (last visited Nov. 8, 2022).

[23] House Report at 256.

[24] *Pricing: Let's Talk Numbers*, AMAZON.COM, https://sell.amazon.com/pricing.html (last visited Nov. 8, 2022).

[25] House Report at 287.

HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

a Prime badge for their product listings."[26]  Prime eligibility is critical because there are more

than 150 million enrollees in the Prime Program in the United States.[27]

32.     Prime is a paid membership program under which enrollees receive free shipping

on Prime products, and other platform benefits.  A loss leader for Amazon,[28] Amazon uses Prime

to lock consumers into the platform.  Having paid Prime enrollment fees out-of-pocket ($14.99

per month or $139 per year), consumers are incentivized to make further purchases on the

platform to recoup this otherwise sunk cost.  Research shows that Prime members are 96% more

likely to buy from Amazon's marketplace than any other online retail site.[29]

33.     In addition to operating the world's largest online marketplace, Amazon is itself

the dominant retailer on that marketplace.  That is, Amazon has its own inventory of products—

both Amazon-branded products and products it procures from other vendors—and Amazon sells

those products on its own platform.  Amazon has reported that approximately 40% of all sales on

its platform are Amazon sales, i.e., products for which Amazon (and not any third-party) is the

merchant and retailer.[30]  These two sales channels—third-party merchant and Amazon-retailed—

can be depicted as follows:[31]

---

[26] House Report at 287.

[27] See https://www.statista.com/statistics/504687/number-of-amazon-prime-subscription-households-usa/ (last visited Nov. 8, 2022).

[28] Analysts estimate that free shipping for Prime users costs Amazon $1 billion every year. Nanette Byrnes, How Amazon Loses on Prime and Still Wins, MIT TECH. REV. (July 12, 2016), https://www.technologyreview.com/2016/07/12/158869/how-amazon-loses-on-prime-and-still-wins/ (last visited Nov. 8, 2022).

[29] Kiri Masters, *89% of Consumers Are More Likely to Buy Products from Amazon than Other E-Commerce Sites: Study*, FORBES (Mar. 20, 2019), https://www.forbes.com/sites/kirimasters/2019/03/20/study-89-of-consumers-are-more-likely-to-buy-products-from-amazon-than-other-e-commerce-sites/?sh=74a1287f4af1 (last visited Nov. 8, 2022).

[30] See Jeff Bezos Shareholder Letter (March 5, 2021) at 1, available at: https://s2.q4cdn.com/299287126/files/doc_financials/2021/ar/Amazon-2020-Shareholder-Letter-and-1997-Shareholder-Letter.pdf (last visited Nov. 8, 2022).

[31] Leanna Zeibak, *How to Win the Amazon Buy Box in 2021*, Tinuitu (March 25, 2021), https://tinuiti.com/blog/amazon/win-amazon-buy-box/ (last visited Nov. 8, 2022).



34.     Whether a consumer purchases a product offered by a third-party merchant or Amazon generally depends on which seller is featured in the "buy box" for the product.  Multiple sellers, including third parties and Amazon, can offer the same product on Amazon's marketplace.  When a consumer selects a product on Amazon, a listing page for that product appears with a white box on the right-hand side containing "Buy Now" and "Add to Cart" buttons.  That is the "buy box."  While consumers have an option to peruse different sellers, only one seller appears in the buy box at any given point in time (although it can change throughout any given day).  When the consumer clicks "Buy Now" or "Add to Cart," the sale goes automatically to the seller in the buy box.  Studies indicate that more than 90% of Amazon's sales go through the buy box.[32]

35.     Amazon has stated that the buy box winner is selected algorithmically, with relevant price, delivery speed and cost, Prime eligibility, and seller performance being considerations.[33]  While third-party merchants may be aware of these factors, only Amazon knows exactly how the algorithm works and which seller will win the buy box for any given product.

[32] *See* House Report at 249.
[33] *See* House Report at 250.

CLASS ACTION COMPLAINT - 12
Case No.
011121-11/2070390 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

C. **Apple and Amazon Compete With Each Other and Third-Party Merchants.**

36.     As the foregoing illustrates, Apple and Amazon are horizontal competitors, and they compete with other online retailers of consumer electronics.  The competition occurs at several levels.

37.     At the highest level, both Apple and Amazon manufacture and retail consumer electronic devices, including devices in the same product categories.  Amazon launched its Fire Tablet to compete with iPad, a Fire Phone to compete with iPhone, and Echo Buds to compete with AirPods.  Apple products are sold not only by Apple and Amazon, but also by third-party merchants listing on Amazon Marketplace.  Apple, Amazon, and the third parties all compete to win sales in these consumer electronic product categories (and others).

38.     There is both inter- and intra-brand competition.  That is, as a manufacturer, Apple wants consumers to buy iPads instead of Amazon's Fire Tablets, no matter which retailer sells them those devices.  But as a retailer, it also wants to sell more iPads than competing retailers of Apple products because, as noted, its profits are higher on sales it facilitates through its own stores.

39.     With respect to intra-brand competition in particular, competition occurs both on Amazon Marketplace and across the larger ecommerce landscape.  Amazon competes as a retailer with third-party merchants selling Apple products on Amazon Marketplace.  Marketplace retailers (Amazon and third parties) also provide competition to Apple and the retail website it operates.  An iPad purchased on Apple's website is an iPad not purchased from an Amazon retailer.  And vice versa.

40.     In this fashion, Apple resellers on Amazon Marketplace constrain Apple's pricing. Low prices on the platform (either by Amazon itself or third-party merchants) exert downward pressure on the prices Apple can sustain on its own online storefront and draw sales volume away from Apple's more profitable direct retail channel and toward its less-profitable wholesale channels.  Conversely, higher platform prices relieve this competitive pressure. Moreover, as explained in more detail *infra*, Amazon as a retailer competes with Apple and other third-party

retailers of Apple products, and lower prices offered by these competitors exerts downward

pricing pressure on Amazon, while having fewer competitors helps to relieve that pressure.[34]

**D.    There Was Active Marketplace Competition in the Sale of Apple Products Before the Unlawful Boycott Agreement.**

41.    Amazon has been a reseller of Apple products since at least 2012.[35]  Before the

Unlawful Boycott Agreement, Amazon Marketplace featured many active Apple resellers, with

whom Amazon competed.  Data indicate that, just prior to the agreement, there were more than

600 third-party merchants offering Apple products on Amazon's platform.  This included

Apple's Authorized Resellers, as well as other retailers lawfully selling Apple inventory.

Neither Apple nor Amazon sought to preclude anyone from selling Apple products on Amazon

Marketplace, provided they complied with all applicable Amazon listing requirements.

42.    The large number of resellers sparked active price competition.  Amazon and its

third-party sellers know that price is key determinant in winning the buy box for any given

product listing and generating platform sales.  More Apple resellers on the platform equals more

price competition on the platform in the sale of Apple products.[36]

43.    This is borne out in the pricing data.  With respect to Apple products, Amazon

and its third-party merchants compete with each other (and for Apple's own customers) by

offering discounts off the prices Apple charges for the same product on Apple's online

storefront.  If Apple is charging $600 for its most recent iPhone, Apple resellers know that they

may be able to attract customers by offering a meaningful discount off that list price.

44.    Before the Unlawful Boycott Agreement, Amazon and its third-party merchants

offered steep discounts on Apple products.  Available data indicate that these discounts were

particularly significant for iPhone and iPad products, which were carried by large numbers of

---

[34] While Amazon competes with Apple in its capacity as a retailer of Apple products, the Amazon *marketplace itself* is not a retailer but rather a two-sided platform mediating transactions between retailers and sellers.  As set forth below, the Amazon Marketplace is in a separate relevant antitrust market.  *See infra*, Section V.

[35] AGCM Decision at ¶ 152.

[36] *What Amazon FBA Sellers Need to Know About Excessive Competition and Price Wars?*, https://www.websiteclosers.com/resources/what-amazon-fba-sellers-need-to-know-about-excessive-competition-and-price-wars (recognizing that a high number of sellers on Amazon Marketplace will trigger price wars) (last visited Nov. 8, 2022).



third-party sellers.  It was common for Apple resellers on Amazon Marketplace to discount the prices of the iPhones and iPads they offered by 20 percent off the list price on Apple's own storefront (e.g., rather than pay $600 for an iPhone in Apple's store, consumers could get it for $480 from Amazon Marketplace).  These discounts decreased substantially after the Unlawful Boycott Agreement went into effect.

45.    Because it faced stiff competition from third-party merchants in the sale of Apple products and was unable to secure a consistent supply of Apple products for its own retail sales, Amazon was only a peripheral seller of Apple products on Amazon Marketplace (representing less than one percent) before entering into the Unlawful Boycott Agreement.[37]  Most sales went to third-party merchants who were actively competing with Amazon on the marketplace (and with Apple outside the marketplace).  Before the Unlawful Boycott Agreement, it was exceedingly rare that Amazon won the buy box (and thus the majority of sales for that product at that point in the day), and when it did, it sold Apple products at prices that were driven down by active third-party price competition.

46.    To protect against counterfeiting, Amazon Marketplace already featured robust protections before the Unlawful Boycott Agreement.  Amazon's 2012 distribution agreement with Apple contained numerous anti-counterfeiting clauses designed "to ensure that no non-genuine Apple products were sold on its marketplace."[38]  In 2017, Amazon augmented this with its "Brand Registry Program," under which brand owners are given a range of tools, free of charge, to guard against counterfeiting.  Over 500,000 brands have enrolled in the program, and they report "on average 99% fewer suspected infringements than before the launch [of the program]."[39]  Amazon has invested in other programs as well, spending millions of dollars every year insulating its platform from counterfeiters.  It now offers a product serialization service

---

[37] *See supra*, Section I.
[38] *See* AGCM Decision at ¶ 152.
[39] *See* AGCM Decision at ¶ 121.

HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    called "Transparency" (launched the same year as the Unlawful Boycott Agreement) that it

2    claims "effectively eliminates counterfeits on enrolled products."[40]

3        47.    In sum, prior to the Unlawful Boycott Agreement, Amazon Marketplace was a

4    highly competitive marketplace, featuring numerous active third-party merchants offering

5    genuine Apple products at prices steeply discounted from the prices Apple wanted to sustain on

6    its online storefront.  And most of the Apple product marketplace sales were going to third-party

7    merchants (rather than to Amazon itself).  All of this benefitted consumers in the form of lower

8    prices and differentiated offerings.  But for Apple and Amazon, it was a threat to the bottom line.

9    **E.    By Agreement, Amazon and Apple Excluded Nearly All Third-Party Merchants
         that Sell Apple Products on Amazon's Platform and Eliminated the Competitive
10       Threat They Posed.**

11       48.    In 2017, Apple and Amazon began to negotiate the renewal of their existing

12   Reseller agreement.  From the outset of these discussions, the parties discussed "gating" third-

13   party merchants that sold Apple products.[41]  According to the Italian Competition Authority

14   ("AGCM"), which reviewed the relevant Apple and Amazon correspondence, the limitations

15   discussed on third-party merchants were not driven by qualitative considerations, they rather

16   were "purely quantitative."[42]  That is, it did not matter which resellers were on the platform or

17   how they performed, just that, from Defendants' point of view, there were too many of them.

18   The purpose and effect, of course, was to limit price competition.  Ultimately Apple proposed,

19   and Amazon agreed, to limit the number of resellers in each country to no more than 20.[43]  This

20   arbitrary and purely quantitative threshold excluded even Authorized Resellers of Apple

21   products.[44]

22       49.    On October 31, 2018, Apple and Amazon executed the Unlawful Boycott

23   Agreement.  It was global in scope, granting Apple the ability to specify for each geographic

24

25   _____

26   [40] *See* Amazon's Congressional Responses, at Response to Question 91.

     [41] *See* AGCM Decision at ¶ 61.

27   [42] *See* AGCM Decision at ¶ 64.

     [43] *See id.*

28   [44] *See* AGCM Decision at ¶¶ 74, 357.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

location the number of Apple resellers permitted to sell new Apple products on Amazon's marketplace.

50.     Amazon has reported that, as of August 2019, only "seven resellers of new Apple products" are authorized under the Unlawful Boycott Agreement in the United States.[45]  As noted, previously more than 600 Apple resellers were operating in Amazon Marketplace.  The Unlawful Boycott Agreement eliminated more than 98 percent of them (593 of at least 600).  The elimination of resellers was particularly severe with respect to iPhones and iPads, Apple's flagship products.  Available data indicate that there were at least 100 unique resellers offering iPhones and at least 500 resellers of iPads on Amazon's platform before the Unlawful Boycott Agreement, and after, no more than seven remained.

51.     The boycott went into effect on January 1, 2019.[46]  Prior to that, Amazon representatives discussed internally how the terms should be communicated.  The official guidance was delivered in an anodyne FAQ script and a cautionary note: "Please try to limit written communication on this topic.  If needed, you must limit strictly to what has been officially communicated today and to the Legal-Approved FAQs attached."[47]  Excluded sellers, including Authorized Resellers of Apple Products, pushed back, but to no avail.  No later than January 5, 2019, their Apple product offers were removed from the platform.[48]

52.     While the Unlawful Boycott Agreement eliminated virtually all other Apple resellers on Amazon Marketplace, it assured Amazon itself (as a retailer) steady access to Apple products and a clear lane to distribute them free of nearly all platform competitors.  In exchange for its agreement to bar nearly all third-party merchants that sold Apple products, Amazon was also granted (by Apple) wholesale discounts on Apple products, potentially reaching above 10%.[49]

---

[45] *See* Amazon Congressional Responses, at Response to Question 94.
[46] *See* AGCM Decision at ¶ 71.
[47] *See* AGCM Decision n.151.
[48] *See id.*
[49] *See* AGCM Decision at ¶ 426.

CLASS ACTION COMPLAINT - 17
Case No.
011121-11/2070390 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

53.     The agreement thus effectively inverted the competitive conditions on Amazon's platform.  Whereas third-party merchants previously dominated sales of iPhones and iPads on Amazon Marketplace, the agreement eliminated this competitive threat and reallocated those marketplace sales to Amazon.[50]  As set forth in the following graphs, discounts dried up on Amazon Marketplace, a result that benefitted Apple because it increased the chances that Apple customers would purchase from Apple's own online store:



---

[50] *See supra*, Sec. I.

CLASS ACTION COMPLAINT - 18
Case No.
011121-11/2070390 V1

1

2



iPad - Number of Sellers vs. Average List Price Percentage

13

### F.     The Unlawful Boycott Agreement Has Had Substantial Anticompetitive Effects.

54.     By eliminating third-party competition, the Unlawful Boycott Agreement harmed both consumers and merchants.

### 1.     Consumers Were Harmed.

55.     For consumers, the severe reduction in third-party Apple resellers on Apple's marketplace resulted in supracompetitive prices.  Before the Unlawful Boycott Agreement, active competition from a large population of resellers ensured that consumers could obtain Apple products through Amazon's buy box at significant discounts to the prices Apple charged on its own online storefront for the same products.  Substantial discounts were available on Apple's most current products, and even steeper discounts on prior iterations within the same product line.

56.     The Unlawful Boycott Agreement sharply reduced the rate of discounting.  Internally, Amazon employees discussed the deterioration in price competitiveness on the platform resulting from the loss of third-party merchants.[51]

---

[51] AGCM Decision at ¶ 108.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

57.     Available data for iPhone and iPad vividly illustrate the price effects.  In the period leading up to the Unlawful Boycott Agreement, the number of unique sellers of Apple products steadily increased to at least 600 unique resellers.  As the number of resellers increased, the rate of discounting increased, with average prices falling to less than 80 percent of the prices Apple was charging on its own website.  In other words, consumers could readily obtain discounts exceeding 20 percent by purchasing Apple products from Amazon resellers rather than from Apple through its online storefront.

58.     The Unlawful Boycott Agreement reversed this trend.  It eliminated virtually all Apple resellers (down to 7 resellers total) and as they fell off the platform, discounts decreased and buy box prices increased commensurately.  As shown below (as well as in Section I of this Complaint), the connection is unmistakable:



59.     The graphic below illustrates the rate of discounting across product vintages for iPhones and iPads.  "Vintage 1" denotes the rate of discounting on then-current Apple iPhone and iPads.  "Vintage 2" and "Vintage 3" denote the rate of discounting on the prior two offerings in the same product line, respectively.  For example, a buy box offer on iPhone 6 would be

1  considered "Vintage 1" when it was the most recently received iPhone.  Once iPhone 7 launched,

2  iPhone 6 became Vintage 2.  With the introduction of iPhone 8, iPhone 6 became Vintage 3.  As

3  reflected below, following the Unlawful Boycott Agreement, discounts on Vintage 1 Apple

4  products decreased markedly, and discounts on older vintages decreased even more so:



5

6

7

8

9

10

11

12

13

14

15

16  60.     Overall, Plaintiff's analysis of pricing data indicates that buy box prices on

   iPhones and iPads were 10% higher, given their vintage, following the Unlawful Boycott

17  Agreement. This comports with the AGCM's own pricing analysis of the Italian market, which

18  estimated a 5-10 precent reduction in the rate of discounting following the agreement.[52]

19

20  61.     By reducing the rate of discounting on Apple products, the Unlawful Boycott

   Agreement also relieved competitive pressure on retailers of competing brands of electronic

21  devices.

22

23  62.     The Unlawful Boycott Agreement also deprived consumers of market

   alternatives.  The multitude of Apple resellers on Amazon's marketplace before the Unlawful

24  Boycott Agreement offered consumers differentiated product offerings.  To compete against

25  hundreds of other merchants on Amazon Marketplace, Apple resellers had to distinguish their

26  listings, not just in terms of price, but also with respect to shipping, returns, promotions, service,

27

28  _____

   [52] See AGCM Decision at Tables 17-20.



and other terms of sale.  This differentiation in offers gave consumers meaningful choice and the ability to find a retailer best suited to their individual needs as to any given purchase.  The Unlawful Boycott Agreement, by eliminating virtually all Apple resellers from Amazon Marketplace, curtailed these options.

### 2. Third-Party Merchants Were Harmed.

63.    The Unlawful Boycott Agreement had anticompetitive effects on the merchant side of Amazon's platform as well.  For merchants, marketplaces like Amazon are valuable only to the extent they provide access to consumers.  The agreement transformed Amazon's marketplace from a platform open to all merchants with Apple inventory into a platform open to Amazon and but a few arbitrarily selected Apple resellers.  The agreement thus deprived virtually all third-party merchants (98%) of an outlet to sell their Apple goods.

64.    For most third-party merchants excluded from the platform, Amazon was not just a channel to sell their Apple inventory, but the *only* channel. Amazon's third-party merchants report that they sell on Amazon because "they cannot turn to alternative marketplaces" to make sales.[53]  Amazon CEO Jeff Bezos told Congress's antitrust subcommittee that "there are a lot of options" for sellers, but the subcommittee, having heard from scores of merchant and merchant associations, rejected that notion: "[t]his claim is inconsistent with [the] investigative record."[54] The reality is that merchants "who try to diversify sales across multiple platforms often report that they are unable to generate many sales outside of Amazon."[55]

65.    Without meaningful alternative distribution channels, many Amazon resellers excluded by virtue of the Unlawful Boycott Agreement were forced to sit on inventory as it became stale and devalued.  All excluded retailers (including Authorized Resellers) were deprived of a viable distribution outlet for Apple products and access to marketplace consumers.

---

[53] House Report at 257.
[54] House Report at 258.
[55] House Report at 258.

CLASS ACTION COMPLAINT - 22
Case No.
011121-11/2070390 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

66.     Moreover, the Unlawful Boycott Agreement, by limiting the number of merchants on the Amazon Marketplace, denied potential new merchants a viable opportunity to enter the market and compete for sales of Apple products.

### 3.     The Unlawful Boycott Agreement Reduced Output.

67.     Without the Unlawful Boycott Agreement, output would have been higher. Output fell in part because, as noted above, excluded third-party merchants were unable to find alternative distribution channels for their Apple inventory. Output fell also relative to a counterfactual world without the Unlawful Boycott Agreement because competitive pricing spurs demand.  As the data show, the Unlawful Boycott Agreement resulted in substantially lower discounts to Apple consumers, and basic economics predicts that lower discounts will cause fewer units to be sold.

### G.     Both Amazon and Apple Secured Anticompetitive Benefits from the Unlawful Boycott Agreement.

68.     Amazon and Apple agreed to foreclose competition from third-party merchants because it benefitted their bottom lines.  Eliminating these competitors allowed Amazon and Apple both to increase their online retail sales of Apple products above what they would have been absent the agreement, while maintaining high prices and thus high margins on each unit sold.

69.     For Amazon, the benefits secured by the Unlawful Boycott Agreement are not difficult to discern.  Amazon received from Apple a consistent supply of Apple's most popular products at a significant discount—potentially exceeding 10 percent—with these discounts being tied directly to Amazon's exclusion of third-party merchants that sold Apple products.[56]  And by eliminating virtually all third-party Apple resellers from Amazon Marketplace, Amazon secured for itself (as a retailer) the lion's share of Apple product sales on its platform, whereas before its sales of Apple products were marginal at best.[57]  Overall, and as the AGCM found, Amazon's profits on the sale of Apple products "increase[d] significantly" as the result of the Unlawful

---

[56] AGCM Decision at ¶¶ 426-27.

[57] *See supra*, Sec. I.

CLASS ACTION COMPLAINT - 23
Case No.
011121-11/2070390 V1



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1   Boycott Agreement.[58] Amazon's increased share of the Apple products sold on its marketplace

2   and its high margins were linked directly to, and flowed from, the agreement's anticompetitive

3   effects—*i.e.*, the exclusion of third-party merchants that sold Apple products.

4         70.     Apple likewise benefited from the elimination of third-party competitors.  In

5   essential respects, the Unlawful Boycott Agreement continues Apple's strategy of scarcity,

6   through which Apple stabilizes its own retail prices and market share (for its own stores) by

7   restricting third-party Apple resellers' access to the market.  Higher consumer prices on Amazon

8   Marketplace benefit Apple by relieving the downward pressure on the prices Apple can charge

9   through its direct distribution channel, thereby protecting its high margins.  The key difference

10  between the Unlawful Boycott Agreement and Apple's prior efforts to sustain high retail prices

11  for its products is that Apple implemented the Unlawful Boycott Agreement with the help of a

12  colluding horizontal competitor.

**H.**    **There is No Procompetitive Justification for the Unlawful Boycott Agreement,**
13         **Much Less One Unattainable Through Less Restrictive Means.**

14        71.     Publicly and in response to the AGCM investigation, Apple and Amazon have

15  asserted that their Unlawful Boycott Agreement was justified to combat the sale of counterfeit

16  Apple products on Amazon's marketplace.  It was not.  The Unlawful Boycott Agreement's

17  restriction on resellers was not qualitative—the parties did not make any effort to identify and

18  exclude known counterfeiters.  Rather, the limitation was "purely quantitative."  Apple set a

19  number, and Amazon accepted it.[59]  In addition, Apple does not enter Authorized Reseller

20  Agreements with counterfeiters; yet, the Unlawful Boycott Agreement excluded *Authorized*

21  *Resellers* of Apple products from selling on Amazon's platform, even when their inventory was

22  *directly sourced from Apple* (*i.e.*, not sourced through a wholesaler).  Finally, if the purpose of

23  the agreement was to eliminate counterfeiters, it would have included refurbished products,

24  which can just as readily be counterfeited.

25

26

27      [58] AGCM Decision at ¶ 421.

28      [59] AGCM Decision at ¶ 456.



72.     The Unlawful Boycott Agreement was also not needed to combat the sale of counterfeit Apple products on Amazon.  When the Unlawful Boycott Agreement was entered, there were already tools available to snuff out counterfeiting.[60]  Most prominently, Amazon had a Brand Registry tool that effectively eliminated counterfeiting on brands enrolled in the program.  According to Amazon, "brands report 99% fewer suspected infringements on average than before the launch of the Brand Registry program."[61]  Amazon told the AGCM that, prior to the Unlawful Boycott Agreement, it had "tried for many years to convince Apple to join the brand registry program, but it was only after the [agreement] was signed that Apple agreed to join."[62]  Apple thus did not need to enter the Unlawful Boycott Agreement to address counterfeiting; it just had to avail itself of existing platform tools that, for years, it had refused to implement.

## V.     RELEVANT MARKET

**A.     There is a Relevant Antitrust Market for Online Consumer Electronics Marketplaces.**

73.     As used in this Complaint, an Online Consumer Electronics Marketplace is an online platform that enables consumers to buy retail goods, including consumer electronics, listed by multiple sellers.  Amazon is the dominant Online Consumer Electronics Marketplace, but there are others, the largest being eBay and Walmart Market.

74.     Because Online Consumer Electronics Marketplaces mediate between buyers and sellers, they operate what economists call a "two-sided platform."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280 (2018) ("*Amex*").  "As the name implies, a two-sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them."  *Id.*

75.     Online Consumer Electronics Marketplaces are also a particular type of two-sided platform known as a "transaction" platform.  "These platforms facilitate a single, simultaneous

---

[60] *See supra*, Sec. IV.B.
[61] AGCM Decision at ¶ 121.
[62] AGCM Decision at ¶ 440.

CLASS ACTION COMPLAINT - 25
Case No.
011121-11/2070390 V1


1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

transaction between participants." *Id.* at 2286. A transaction platform cannot transact a sale with a participant on one side of the platform without simultaneously transacting the sale with a participant on the other side. For Online Consumer Electronics Marketplaces, the platform intermediates transactions between willing buyers and sellers of consumer electronics. On Amazon Marketplace, for example, a sale does not occur until a consumer agrees to purchase a product from a merchant listing on the platform.

76. One feature of two-sided platforms, including Online Consumer Electronics Marketplaces, is that they exhibit "indirect network effects." *See id.* at 2281. Indirect network effects arise when the value of the platform on one side depends on how many participants the platform sustains on the other. For example, an Online Consumer Electronics Marketplace with few sellers is less attractive to buyers as compared to a marketplace with a greater number of sellers. Likewise, an Online Consumer Electronics Marketplace with few buyers will have difficulty attracting sellers. By contrast, when a two-sided transaction platform secures a critical mass of participants on one side, it becomes far more attractive to participants on the other. This can create a feedback loop of demand fueling participation on both sides of the platform and, by consequence, a greater number of platform transactions.

### a. Single-Merchant Online Stores Are Not Reasonable Substitutes.

77. There are several online consumer electronics retailers that do not function as marketplaces, including retailers that sell Apple products. Examples include the online Apple Store and Best Buy. These single-merchant online stores are not in the same relevant market as Online Consumer Electronics Marketplaces.

78. Unlike marketplaces, single-merchant online retailers do not host a range of sellers or mediate *transactions* between sellers and buyers. Because they are not transaction platforms, these online retailers do not compete with Online Consumer Electronics Marketplaces for *transactions*. The Supreme Court has recognized in this respect that "[o]nly other two-sided platforms can compete with a two-sided platform for transactions." *Amex*, 138 S. Ct. at 2287. That is, while there may be differing competitive dynamics on each of the two sides of a transaction platform, for market definition purposes, a transaction platform cannot be broken out

1    into "two separate markets." *Id.* at 2283.  "In two-sided transaction markets, only one market

2    should be defined." *Id.* at 2287.

3        79.    Single-merchant online retailers are also not functionally interchangeable with

4    Online Consumer Electronics Marketplaces.  Because Online Consumer Electronics

5    Marketplaces are two-sided platforms, substitution on both the buy and sell sides of the platform

6    must be considered.

7        80.    On the consumer side, competition with single-merchant online stores is

8    asymmetrical.  Online Consumer Electronic Marketplaces impose substantial constraints on

9    single-merchant online stores, given the relative ease of purchasing goods from a marketplace

10   instead of a single-merchant store.  But substitution in the other direction—from marketplaces to

11   single-merchant stores—is more limited.

12       81.    *First*, there are substantial numbers of consumers who purchase from

13   marketplaces because, by definition, marketplaces offer an incomparable array of products and

14   the ability to "one stop shop."  Single-merchant online stores cannot offer the same functionality

15   and convenience, and thus a significant number of consumers will purchase products on

16   marketplaces even when they can be obtained at lower prices from single-merchant outlets.  For

17   example, it is not uncommon for consumers to buy goods at a supermarket (e.g., baked goods)

18   that could be obtained at a lower cost from an individual retailer (a bakery).  The convenience of

19   obtaining many goods together often permits a marketplace to impose a price premium.  This

20   implies that while a price increase by a single-merchant outlet may drive significant customer

21   defections to a competing marketplace, a price increase by a marketplace is less likely to cause

22   significant defections to single-merchant outlets.

23       82.    This is particularly true for online marketplaces.  By purchasing from a single

24   online marketplace, consumers need only manage one account with order, payment, and shipping

25   details.  Searching out products across online retailers, and managing multiple purchaser

26   accounts, is time consuming and burdensome.  Many consumers prefer the ease of a one-stop

27   online marketplace, even if it means they pay a little more for the goods they purchase.  For

28   example, among Amazon Prime members, 92% look forward to being able to order all goods

through one retailer and 93% are more likely to buy from Amazon Prime than directly from a retailer's online site.[63]

83.     *Second,* because they offer an array of everyday products, marketplaces can (and do) establish programs that incentivize platform loyalty. Amazon's Prime subscription service is but one example.[64] Through its Prime program, Amazon offers consumers free shipping and other incentives for a monthly (or annual) fee. For Prime enrollees, the program fees are a sunk cost. To recoup them, enrollees must continue to make Prime purchases and gain the associated benefits justifying the outlay of enrollment fees (e.g., free shipping). An industry analyst estimates that 82% of U.S. households have a Prime account.[65] Emphasizing the way Prime "lock[s] [most] consumers into the Amazon ecosystem," the Congressional antitrust subcommittee concluded that "Amazon also enjoys significant power over online consumers."[66]

84.     Even if there were fluid and symmetrical substitution on the consumer side of the Online Consumer Electronics Marketplace, this alone would not support including single-merchant online stores within the same relevant antitrust market. As the Supreme Court has cautioned, "focusing on one dimension of competition tends to distort the competition that actually exists among two-sided platforms." *Amex*, 138 S. Ct. at 2287 (internal quotation marks, ellipses, and bracket marks omitted). Such is the case with the Online Consumer Electronics Marketplace. On the other side of the transaction platform—the seller side—single-merchant stores are not a remotely reasonable substitute. That is, a third-party seller on Amazon Marketplace cannot, for example, sell iPhones on Best Buy's website or within Apple's online store. Moreover, most third-party merchants are small operations without the resources and notoriety needed to establish a successful online store for themselves.

---

[63] Patrick Munden, *The Amazon Prime Effect - setting a new standard for customer loyalty,* https://www.wundermanthompson.com/insight/the-amazon-prime-effect (last visited Nov. 8, 2022).

[64] Walmart's answer to Amazon Prime is Walmart Plus, a similarly structured program.

[65] April Berthene, 82% of US households have an Amazon Prime membership, https://www.https://www.digitalcommerce360.com/2019/07/11/82-of-us-households-have-a-amazon-prime-membership/ (last visited Nov. 8, 2022).

[66] House Report at 259.

CLASS ACTION COMPLAINT - 28
Case No.
011121-11/2070390 V1

HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

85.     This much was reported by the Online Merchants Guild, which advised Congress that "[m]any Amazon sellers use websites such as Shopify to try to establish their own eCommerce presence, but without the ability to market to their supposed core customer base, their Amazon customers, it's pretty futile."[67]  As the House subcommittee on antitrust concluded, it is "clear that Amazon has monopoly power over most third-party sellers and many of its suppliers" and sellers are "forced on Amazon because that is where the buyers are."[68]  It is estimated that "37% of Amazon's third-party sellers, representing over 85,000 sellers, rely on Amazon as their sole source of income."[69]

86.     That some large Amazon consumer electronics sellers (*e.g.*, Dell) also maintain their own retail website shows only that Online Consumer Electronics Marketplaces and single-merchant online retail are complements, not substitutes.

87.     A common method to determine the relevant market is to find whether a hypothetical monopolist could impose a small but significant non-transitory increase in price ("SSNIP") in the proposed market, typically 5%.  A hypothetical monopolist in the Online Consumer Electronics Marketplace Market could profitably impose a SSNIP on its platform— that is, sustain a significant price increase without losing volume sufficient to make the price increase unprofitable.  Amazon itself shows that a hypothetical monopolist's pricing power and ability to sustain an SSNIP is not constrained by any substitution occurring on the seller side of the transaction platform.  Amazon has regularly increased the fees it charges its third-party merchants to sell on Amazon Marketplace.  Between 2015 and 2020, Amazon increased the average commission it charges sellers from 19% to 30%, meaning that Amazon increased sellers' own costs by 58%.[70] And yet the number of third-party merchants on its platform has tripled over the same period.[71]  In addition, Amazon's "Most Favored Nation" or "MFN" policies

---

[67] House Report at 258.
[68] House Report at 257.
[69] House Report at 249.
[70] House Report at 274.
[71] Compare *Amazon Tops Six Million Third-Party Sellers*, Marketplace Pulse (Mar. 24, 2021), https://www.marketplacepulse.com/articles/amazon-reaches-six-million-third-party-sellers (last visited Nov. 8, 2022) with Sarah Perez, Amazon's Third-Party Sellers Ship Record-

prevent the third-party merchants from increasing their prices on the platform relative to other online outlets, thus minimizing the likelihood of substitution occurring on the consumer side of the transaction platform.[72]  And in fact, Amazon doubled its share of the U.S. online retail revenue to 56.7% in 2021 from 28.1% in 2014.[73]  And Amazon Prime membership tripled in the same period.[74]

> **b.    Brick-and-Mortar Stores Are Not Reasonable Substitutes**

88.    Conventional brick-and-mortar outlets—including brick-and-mortar two-sided marketplaces[75]—are not a reasonable substitute for Online Consumer Electronics Marketplaces. Again, substitutability (or lack thereof) on both the buyer and seller sides of the platform must be evaluated.

89.    From the perspective of consumers, Online Consumer Electronics Marketplaces facilitate seamless shopping across a wide range of goods or services, all from home or on the move using internet-enabled devices.  In contrast to brick-and-mortar retail, consumers are also not constrained by their physical location when using an Online Consumer Electronics Marketplace.  Instead, they can readily purchase goods from retailers across the country offering nationwide shipping.  Online shopping also minimizes the risk that a product is out of stock because online retailers typically store larger volumes of goods and stock a more diverse inventory than physical stores.

---

Breaking 2 Billion Items In 2014, But Merchant Numbers Stay Flat, TechCrunch (Jan. 5, 2015), https://techcrunch.com/2015/01/05/amazon-third-party-sellers-2014/ (last visited Nov. 8, 2022).

[72] House Report at 295: *see also Frame-Wilson v. Amazon.com, Inc.*, No. 2:20-cv-00424-RAJ, 2022 U.S. Dist. LEXIS 44109 (W.D. Wash. Mar. 11, 2022).

[73] *Amazon's Share of US eCommerce Sales Hits All-Time High of 56.7% in 2021*, https://www.pymnts.com/news/retail/2022/amazons-share-of-us-ecommerce-sales-hits-all-time-high-of-56-7-in-2021/ (last visited Nov. 8, 2022).

[74] Brian Dean, Amazon Prime User and Revenue Statistics (2022), https://backlinko.com/amazon-prime-users (last visited Nov. 8, 2022)

[75] Consignment stores and auction houses could be considered two-sided marketplaces because, like Online Consumer Electronics Marketplaces, they provide transaction services matching willing buyers and sellers.  However, these sellers are not reasonable substitutes for online consumer electronics marketplaces because, among other considerations, it is not their core business to offer new products for immediate purchase at a set price.  *See In re Ebay Seller Antitrust Litig.* No. C 07-01882 JF (RS), 2010 U.S. Dist. LEXIS 19480, at *19-*28 (N.D. Cal. Mar. 4, 2010).

CLASS ACTION COMPLAINT - 30
Case No.
011121-11/2070390 V1


1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

90.     In addition to avoiding the need to travel to a physical location, Online Consumer Electronics Marketplaces such as Amazon's offer other significant conveniences when compared to conventional brick-and-mortar retailers.  Once a consumer creates an account with an online retail platform, the platform stores a host of details such as payment information, delivery addresses, and past purchases.  This information allows consumers to order or re-order items with minimal transaction costs, sometimes with a single click.

91.     For sellers, brick-and-mortar retail is likewise not reasonably interchangeable with Online Consumer Electronics Marketplaces.  Establishing a physical store requires substantial start-up costs and overhead (rent, maintenance, staffing, insurance, property taxes, etc.).  A physical store is likewise constrained by its location and unable to reach consumers in different locales.  Online Marketplaces, by contrast, offer sellers access to a large and geographically diverse population of consumers, without the costs of maintaining a physical retail presence.  That some brick-and-mortar retailers also sell through Online Consumer Electronics Marketplaces shows that these outlets are complements, not substitutes.

92.     In sum, and considering both the buy and sell sides, there is little cross-elasticity of demand between Online Consumer Electronics Marketplaces and single-merchant online stores.  A hypothetical monopolist in the Online Consumer Electronics Marketplace Market could profitably sustain a substantial price increase (a SSNIP) without substitution to brick-and-mortar retail in numbers sufficient to make the price increase unprofitable.

**B.     The Relevant Geographic Market is the U.S.**

93.     Most Online Consumer Electronics Marketplaces, including Amazon, operate their marketplaces within national boundaries.[76]  Product availability, prices, and shipping options vary between U.S. online marketplaces and marketplaces specific to other countries.[77]  There is a relevant U.S. geographic market for Online Consumer Electronics Marketplaces.

---

[76] Autorita' Garante della Concorrenza e del Mercato, Dec. 9, 2021 report, ¶¶ 85-90 https://www.agcm.it/dotcmsdoc/allegati-news/A528_chiusura%20istruttoria.pdf (last visited Nov. 8, 2022).

[77] *See* Adam Rozsa, *Buying From Amazon in a Different Country? Do they ship internationally?*, https://wise.com/us/blog/buying-from-amazon-in-a-different-country (last visited Nov. 8, 2022).



**C.      Amazon Has Substantial Market Power in the Market for U.S. Online Consumer Electronics Marketplaces.**

94.      Amazon operates the largest Online Consumer Electronics Marketplace in the United States.  As observed by the House subcommittee on antitrust, Amazon is "the dominant online marketplace."[78]  An industry analyst suggests that Amazon controls as much as 90% of all U.S. online marketplace sales and that eBay and Walmart, Amazon's closest rival marketplaces, have only peripheral shares.[79]

95.      Amazon's market power is durable and reinforced by several features of the Online Consumer Electronics Marketplace Market.

96.      To begin with, barriers to entry are high.  As Amazon itself recognizes, building an online marketplace "'require[s] significant incremental investments in brand development, inventor, and marketing/customer acquisition.'"[80]  Prominent economists have observed that "[d]igital platforms combine economies of scale, low marginal costs, economies of scope through data and an installed base of users, network effects, multi-sidedness, and sometimes a global reach."[81]  The combination of these attributes "tend[s] to generate concentrated markets, or market structures containing few firms," and, "[w]ith the addition of inertial (or 'sticky') consumers these markets feature high entry barriers which make it difficult for new firms to enter the market to create competition."[82]

97.      Indirect network effects pose a particularly substantial hurdle to entrants, cementing Amazon's market power.  Building a successful marketplace requires securing a critical mass of consumers and merchants on the platform.  Strong participation on both sides of the platform generates a feedback loop of demand, with consumers attracted to the large roster of merchants, and merchants attracted to the large population of consumers.  A startup marketplace

---

[78] House Report at 255.

[79] *Supra*, *Amazon Marketplace is 25% of US E-commerce*.

[80] House Report at 260 (quoting internal Amazon analysis).

[81] Testimony of Fiona M. Scott Morton, Ph.D., House Judiciary Committee (Mar. 7, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-ScottMortonF-20190716.pdf (last visited Nov. 8, 2022).

[82] *Id.*

CLASS ACTION COMPLAINT - 32
Case No.
011121-11/2070390 V1



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

with a limited customer base will be unable to attract merchants, and likewise a marketplace with few merchants will be of limited interest to consumers.  It is thus extremely difficult for new entrants to unseat an incumbent marketplace with a critical mass of buyers and sellers.

98.     Having obtained this critical mass, Amazon benefits from substantial indirect network effects.  It has hundreds of millions of regular customers, including 163 million Amazon Prime users, and 2.3 million third-party merchants.[83]

99.     Competing for these consumers and merchants is particularly difficult because of the high costs of switching to an alternative marketplace.  Through regular use, consumers grow accustomed to Amazon's platform and all its quirks, while building out an order history from which they can make repeat purchases.  An industry analyst estimates that 82% of U.S. households have a Prime account.[84]  "American households that have Prime memberships are effectively locked into Amazon for their online shopping," as they think they are recouping the sunk costs of their Prime membership when they make additional purchases on Amazon's marketplace.[85]  "Prime members will continue to use Amazon and not switch to competing platforms, despite higher prices and lower-quality items on Amazon compared to other marketplaces, and despite recent increases in the price of a Prime membership."[86]

100.    On the other side of the platform, Amazon has amassed 2.3 million merchants.  By way of comparison, Walmart has just 54,000 sellers on its marketplace.[87]  There is platform stickiness for merchants as well.  Merchants build up reviews and ratings that instill consumer confidence.  These reviews and ratings are not readily ported to another platform.[88]  A merchant transitioning to a new platform thus needs to start from scratch to build up a profile.

---

[83] David Chang, *The average Amazon Prime member spends this much per year,* Motley Fool (Jul. 22, 2022), https://www.fool.com/the-ascent/personal-finance/articles/the-average-amazon-prime-member-spends-this-much-per-year/ (last visited Nov. 8, 2022); House Report at 249.

[84] Fareeha Ali, *Amazon's Prime Day sales will jump 46%.* https://www.digitalcommerce360.com/2019/07/10/amazon-prime-day-predicitions/ (last visited Nov. 8, 2022).

[85] House Report at 256.

[86] House Report at 260.

[87] House Report at 87.

[88] House Report at 42.

HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

101.   Even if a merchant were to prefer a rival platform—for example because of lower transaction fees—Amazon makes it difficult for that merchant to transition its consumers to the rival.  Amazon does this in part by generally forbidding "sellers from contacting their customers."[89]  More prominently, Amazon MFN policies prevent merchants from using price differentials to steer consumers to platforms that compete with Amazon.[90]  They likewise inhibit competing marketplaces from using lower transaction fees to attract consumers to their platforms, because lower fees can (by virtue of the MFN) never be passed through to benefit consumers in the form of lower prices.

102.   Direct evidence of Amazon's market power also abounds.  Retailers report that, with Amazon dominating the market they "don't have a choice but to sell through Amazon."[91]  For example, one Amazon merchant informed Congress: "Were we to be suspended from selling on Amazon.com, it would probably take 3 – 6 months before we'd be bankrupt.  We are not alone.  This is typical for small to medium sized businesses which sell online today.  In fact, most companies like our own, would probably go bust even faster."[92]  "Virtually every manufacturer and retailer of consumer goods in America faces [the] same predicament," explained the co-director of Institute for Local Self-Reliance.[93]

103.   Amazon's market power is further evident in its ability to raise prices above the competitive level.  Through listing and other fees, Amazon secures for itself 27% of every dollar spent on Amazon.com.[94]  Rival marketplaces (like eBay) impose significantly lower fees, and yet Amazon continues to grow its market share.  Amazon's own analyses reflect its substantial

[89] House Report at 258.

[90] House Report at 295.

[91] House Report at 87, 270.

[92] Molson Hart, *How Amazon's Business Practices Harm American Consumers: Why Amazon Needs a Competitor and Why Walmart Ain't It*, MEDIUM (July 18, 2019), https://medium.com/swlh/amazon-needs-acompetitor-and-walmart-aint-it-5997977b77b2 (last visited Nov. 8, 2022).

[93] Testimony of Stacy F. Mitchell, Co-Director Institute for Local Self-Reliance, House Judiciary Committee (Jul. 16, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-MitchellS-20190716.pdf (last visited Nov. 8, 2022).

[94] Karen Weise, Prime Power: How Amazon Squeezes the Businesses Behind Its Store, N.Y. TIMES (Dec. 19, 2019), https://www.nytimes.com/2019/12/19/technology/amazon-sellers.html (last visited Nov. 8, 2022).

CLASS ACTION COMPLAINT - 34
Case No.
011121-11/2070390 V1

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1   pricing power.  One report concluded that "seller attrition" from a 2018 price increase was

2   "[n]othing significant."[95]  And this is to say nothing of Amazon's Unlawful Boycott Agreement,

3   which as set forth above, led to a substantial price increase that consumers absorbed.

4   **D.     Amazon Would Have Market Power in a Broader Online Electronics Retail Market.**

5         104.    As set forth above, the Unlawful Boycott Agreement at issue restrains trade on

6   Amazon's platform—a two-sided transaction platform that, by law, cannot be lumped with one-

7   sided retailers in a single relevant antitrust market.  Given this, the relevant market excludes

8   single-merchant online stores, which cannot (and do not) mediate platform transactions.

9         105.    Yet even if the relevant market were enlarged to include single-merchant online

10  electronics retailers—including Apple, Best Buy, and all others—Amazon would sustain market

11  power.  Amazon is the largest online retailer of electronics in the United States.  It has 82% of

12  the online consumer electronics market.[96]  There is, moreover, widespread industry and public

13  recognition that Amazon dominates across all ecommerce categories.  As the Congressional

14  antitrust subcommittee concluded, "Amazon has significant and durable market power in the

15  U.S. online retail [sales] market."[97]

16                    **VI.     INTERSTATE TRADE AND COMMERCE**

17        106.    The conduct of Defendants as alleged in this Complaint was within the flow of,

18  and substantially affected, interstate commerce.  The Relevant Market and sale of consumer

19  electronics by Amazon, Apple, and third-party merchants operates across, and without regard to,

20  state lines.

21                         **VII.    CLASS ALLEGATIONS**

22        107.    Plaintiff brings this proposed class action for damages and injunctive relief

23  pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3).

24        108.    Plaintiff brings this action on Plaintiff's own behalf and on behalf of the

25  following class:

26  _____

27        [95] House Report at 274.
          [96] 2019 Jumpshot report at 21.
28        [97] House Report at 15.

CLASS ACTION COMPLAINT - 35
Case No.
011121-11/2070390 V1



All persons and entities who, as residents of the United States and during the period of January 1, 2019, to the date of class notice, purchased any new iPhone or iPad from the Buy Box on Amazon.com.

109. For purposes of the Class Definition, the "Buy Box is the box on the top righthand side of product listings on Amazon.com."  The Buy Box contains "Add to Cart" and "Buy Now" buttons that customers can use to make a purchase.

110. Excluded from the proposed Class are the Defendants; Defendants' affiliates and subsidiaries; Defendants' current or former employees, officers, directors, agents, and representatives; the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members; and all governmental entities.

111. **Numerosity:** The exact number of the members of the proposed Class is unknown and is not available to Plaintiff at this time, but upon information and belief, the class will consist of many thousands of members such that individual joinder in this case is impracticable.

112. **Commonality:** Numerous questions of law and fact are common to the claims of the Plaintiff and members of the proposed Class. These include, but are not limited to:

a. Whether Amazon and Apple entered an agreement to restrict the number of third-party merchants capable of offering Apple Products on Amazon.com;

b. Whether there is an antitrust market (or submarket) for Online Consumer Electronics Marketplaces;

c. Whether Defendants have unlawfully restrained trade in any relevant antitrust market;

d. Whether consumers have been harmed by Defendants, including by having paid higher prices for Apple Products than they would have absent Defendants' challenged conduct;

e. Whether Plaintiff and members of the proposed Class are entitled to declaratory or injunctive relief to halt Defendants' unlawful practices, and to their attorney fees, costs, and expenses; and

CLASS ACTION COMPLAINT - 36
Case No.
011121-11/2070390 V1



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

f.    Whether Plaintiff and members of the proposed Class are entitled to any damages or restitution incidental to the declaratory or injunctive relief they seek, or otherwise.

113.   **Typicality:** Plaintiff's claims are typical of the claims of the members of the proposed Class.  The factual and legal bases of Defendants' liability are the same and resulted in injury to Plaintiff and all of the other members of the proposed Class.

114.   **Adequate representation:** Plaintiff will represent and protect the interests of the proposed Class both fairly and adequately.  Plaintiff has retained counsel competent and experienced in complex class-action litigation.  Plaintiff has no interests that are antagonistic to those of the proposed Class, and his interests do not conflict with the interests of the proposed class members he seeks to represent.  Class counsel have invested substantial resources developing these claims, and are qualified and best positioned to lead the representation of the proposed Class.

115.   **Prevention of inconsistent or varying adjudications:** If prosecution of myriad individual actions for the conduct complained of were undertaken, there may be inconsistent or varying results.  This would have the effect of establishing incompatible standards of conduct for the Defendants.  Certification of Plaintiff's proposed Class would prevent these undesirable outcomes.

116.   **Injunctive and declaratory relief:** By way of the conduct described in this Complaint, Defendants have acted on grounds that apply generally to the proposed Class.  Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

117.   **Predominance and superiority:** This proposed class action is appropriate for certification.  Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable.  Even if members of the proposed Class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter.  Here, the class action device will present far fewer

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court.  Further, uniformity of decisions will be ensured.

## VIII.   ANTITRUST INJURY AND STANDING

118.    During the Class Period, Plaintiff and members of the proposed Class directly made purchases on Amazon Marketplace.  Because of the anticompetitive conduct alleged in this Complaint, Plaintiff and Class members were forced to pay more for those purchases than they would have if Amazon and Apple had not entered the Unlawful Boycott Agreement to eliminate third-party Apple resellers from Amazon Marketplace.  Defendants therefore have caused Plaintiff and Class members to suffer overcharge damages.  Because Defendants continue to exclude third-party Apple resellers from Amazon Marketplace, Plaintiff and Class members are reasonably likely to incur future overcharges when they make additional purchases on Amazon Marketplace. Plaintiff and Class members have standing as direct purchasers of goods sold on Amazon Marketplace at an inflated price.  Both the actual harm and the threat of future harm are cognizable antitrust injuries directly caused by Defendants' violations of federal antitrust laws, including the Unlawful Boycott Agreement.  The full amount of such overcharge damages will be calculated after discovery and upon proof at trial.

## IX.   CLAIM FOR RELIEF

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT – 15 U.S.C. § 1
### UNREASONABLE RESTRAINT OF TRADE – CONCERTED REFUSAL TO DEAL /
### GROUP BOYCOTT

119.    Plaintiff adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

120.    Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

121.    As discussed *supra*, at all relevant times prior to and during the conspiracy alleged, Apple and Amazon have been and are horizontal competitors that compete with one



another and other online retailers of consumer electronics, including but not limited to third-party merchants selling Apple products on Amazon Marketplace. Amazon competes in this manner while wearing its hat as an online retailer selling consumer electronics. But Amazon also wears a different hat, running the largest online retail marketplace and the most visited ecommerce website in the world. Amazon's dual "hats" have been critical to Amazon in carrying out its role in the unlawful conspiracy discussed in this Complaint.

122.     Beginning at least as early as October 31, 2018, Apple and Amazon (together, Defendants), by and through their officers, directors, employees, agents or other representatives, entered into a continuing horizontal contract, agreement, and conspiracy in restraint of trade to effectuate a concerted refusal to deal/group boycott (the Unlawful Boycott Agreement), which went into effect on January 1, 2019.

123.     In exchange for certain consideration discussed in more detail *supra*, pursuant to Defendants' Unlawful Boycott Agreement, Apple proposed, and Amazon agreed, to refuse to permit all but a few Amazon third-party merchants to sell new Apple products on Amazon's marketplace. Al other third-party merchants were prohibited from listing Apple products on the marketplace. The limitations pursuant to this boycott were purely quantitative and not done for any qualitative reasons. Defendants limited the number of Apple resellers on Amazon's marketplace in each country, including the United States. This arbitrary and purely quantitative threshold had the effect of excluding even Authorized Resellers of Apple products. Before the Unlawful Boycott Agreement, more than 600 Apple resellers were operating on Amazon Marketplace. But the Unlawful Boycott Agreement had the effect of eliminating more than 98 percent (593 of at least 600) of third-party Apple product resellers.

124.     Amazon and Apple agreed to this concerted refusal to deal/group boycott of numerous Apple resellers because it benefited their bottom lines. By eliminating third-party merchants that sold Apple products, Amazon and Apple—as online merchants in horizontal competition with one another—were able to reallocate online sales of Apple products between themselves, maintaining high prices and thus high margins on each unit sold.

CLASS ACTION COMPLAINT - 39
Case No.
011121-11/2070390 V1

HB  HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

125.     The Unlawful Boycott Agreement harmed competition in the relevant antitrust market alleged, the U.S. Online Consumer Electronics Marketplace, where Amazon has substantial market power as the owner and operator of Amazon Marketplace—82% of the online electronics market and 90% of online marketplace sales generally.  *See supra*, Part V. As discussed in Section IV.F, the Unlawful Boycott Agreement increased consumers prices and decreased consumer choice.  The severe reduction in third-party Apple resellers on Amazon Marketplace lessened the rate of discounting, and deprived consumers of market alternatives. The Unlawful Boycott Agreement also had anticompetitive effects on the merchant side of Amazon's platform.  For most third-party Apple resellers excluded from the platform, Amazon was not just a channel to sell their Apple inventory, but the *only* channel.  Indeed, many online merchants report that they sell on Amazon because "they cannot turn to alternative marketplaces" to make sales.[98]  The Unlawful Boycott Agreement denied most third-party merchants of Apple products the economic relationships they need to compete in the market, because they were deprived of a viable distribution outlet for Apple products and denied critical access to Amazon Marketplace's massive customer base. The Unlawful Boycott Agreement, by restricting the number of merchants on the Amazon Marketplace, also denied potential merchants a viable opportunity to enter the market and compete for sales.

126.     Defendants' purported competitive justifications for the Unlawful Boycott Agreement are pretextual or not viable.  The Unlawful Boycott Agreement was not reasonably needed or designed to eliminate counterfeits.  Nor do the antitrust laws justify the elimination of hundreds of competing Apple resellers from Amazon Marketplace to secure for Amazon (in its retail capacity) a steady supply of Apple goods.[99]   Defendants Apple and Amazon have thus engaged in a naked *per se* unlawful concerted refusal to deal/group boycott and this Court does

---

[98] House Report at 257.

[99] *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (The antitrust laws . . . were enacted for the protection of competition not competitors.") (quotation omitted); *PLS.Com, LLC. v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 836 (9th Cir. 2022) ("[S]paring consumers the need to patronize competing firms is not a procompetitive justification for a group boycott.").

1  not need to engage in a detailed assessment of the anticompetitive effects of Defendants'

2  conduct.

3      127.   However, in the alternative only, even if Defendants' conduct does not constitute

4  a *per se* illegal refusal to deal/group boycott, a detailed analysis of Defendants' agreement would

5  demonstrate that this arrangement violates the rule of reason and is illegal.

6      128.   As consumers who purchased new Apple products on the Amazon Marketplace

7  after implementation of the Unlawful Boycott Agreement, Plaintiff and the Class have been

8  harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended

9  to prevent, including by paying higher prices for those products than they would have paid

10  absent Defendants unlawful agreement.

11      129.   The amount of damages suffered by Plaintiff and members of the Class has not

12  yet been ascertained.  Pursuant to Section 4 of the Clayton Act, Plaintiff is entitled to recover

13  from Defendants treble the amount of actual damages, as well as an award of reasonable

14  attorneys' fees and costs of suit.

15      130.   Plaintiff and members of the Class are entitled to a permanent injunction that

16  terminates the ongoing violations alleged in this Complaint.

## PRAYER FOR RELIEF

18  WHEREFORE, Plaintiff respectfully requests the following relief:

19      A.   That the Court certify this case as a class action and that it appoint Plaintiff as

20  class representative and its counsel as class counsel;

21      B.   That the Court award Plaintiff and the proposed Class all appropriate relief, to

22  include, but not be limited to, injunctive relief requiring that Amazon and Apple cease the

23  abusive, unlawful, and anticompetitive practices described herein; declaratory relief, adjudging

24  such practices unlawful; as well as monetary relief, whether by way of restitution or damages,

25  including treble damages, or other multiple or punitive damages, or restitution, where mandated

26  by law or equity or as otherwise available; together with recovery of the costs of suit, to include

27  reasonable attorneys' fees, costs, and expenses, together with pre- and post-judgment interest to

28  the maximum levels permitted by law or equity.

CLASS ACTION COMPLAINT - 41
Case No.
011121-11/2070390 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

C.      That the Court grant such additional orders or judgments as may be necessary to prevent the unlawful practices complained of herein; and

D.      That the Court award Plaintiff and the proposed Class such other, favorable relief as may be available and appropriate under federal or state law, or at equity.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

DATED this 9th day of November, 2022.

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By */s/ Steve W. Berman*
    Steve W. Berman (WSBA No. 12536)
By */s/ Barbara A. Mahoney*
    Barbara A. Mahoney (WSBA No. 31845)
1301 Second Avenue Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
barabaram@hbsslaw.com

Ben M. Harrington (*pro hac vice forthcoming*)
Benjamin J. Siegel (*pro hac vice forthcoming*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
benh@hbsslaw.com
bens@hbsslaw.com

