# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JOLENE FURDEK and JONATHAN RYAN, individually and on behalf of all others similarly situated, | Case No. 2:22-cv-01599 |
| Plaintiffs, | DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION PURSUANT TO FED. R. CIV. PRO 59(e) & 60(b) |
| v. | |
| AMAZON.COM, INC., a Delaware corporation, AND APPLE, INC., a California corporation | |
| Defendants | |

## DECLARATION

I, BROOKS HOLLAND, declare the following information to be true and accurate, to the best of my knowledge, subject to the penalties of perjury:

1) I have been retained by Hagens Berman, counsel for Plaintiffs in the above-captioned matter, to submit an opinion regarding Plaintiffs' October 27, 2025, motion pursuant to Federal Rules of Civil Procedure 59(e) and 60(b) to alter or amend a judgment, requesting that the District Court reconsider its September 29, 2025, Order ("Order") dismissing this matter. This declaration expresses my expert opinion regarding ethical issues that the Order addressed. As part of this declaration, I affirm that I have no personal interest in this litigation outside of my professional role in this declaration,[1] and, to the best of my knowledge, I have no conflict of interest with any party or attorney in this matter.

---

[1] Hagens Berman is compensating my time in preparing this declaration at $250 an hour.

DECLARATION                    -1-                    BROOKS HOLLAND

**Experience & Qualifications**

2)  I am a Professor of Law with tenure at Gonzaga University School of Law, where I have taught since August 2005.[2] This declaration reflects my individual professional opinion and does not necessarily represent the views of Gonzaga University or the School of Law. At Gonzaga, I have held the J. Donald & Va Lena Scarpelli Curran Professorship in Legal Ethics and Professionalism for the past ten years, and I regularly teach professional responsibility. When teaching professional responsibility, I use my own professional responsibility textbook, LEARNING PROFESSIONAL RESPONSIBILITY: FROM THE CLASSROOM TO THE PRACTICE OF LAW (West 2nd ed. 2018) (with L. Christensen). I am under contract to publish the third edition in 2026, now as the sole author.

3)  My published scholarship exceeds 65 publications, and it often focuses on legal ethics, in particular advocacy ethics in vulnerable client representation. My scholarship has been cited in more than 350 sources, including citations by the U.S. Court of Appeals for the Sixth Circuit and the Supreme Courts of Iowa, Kansas, Maryland, Massachusetts, and Vermont.

4)  In my role as a law professor, I have served on numerous boards and committees relating to law and legal ethics. This service includes six years on the Washington State Bar Association (WSBA) Committee on Professional Ethics, from 2017-2023, and six years on the WSBA Council on Public Defense, from 2010-2016. I served as Chair of the Council on Public Defense from 2014-2016. I currently serve on the Board of Governors of the Society of American Law Teachers, and I serve on the professional responsibility sections of the Association of American Law Schools and the International Bar Association. The Washington Supreme Court also recently appointed me to a Task Force addressing the Supreme Court's indigent defense certification standards.

---

[2] For a copy of my public *curriculum vitae*, *see* https://www.gonzaga.edu/school-of-law/about/faculty-staff/regular-faculty/detail/brooks-r-holland-jd-34df1499 (last visited October 15, 2025).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

5) I am a licensed attorney in good standing in the State of New York since 1995, and I am also admitted in the U.S. Court of Appeals for the Ninth Circuit and the U.S. Court of Appeals for the Armed Forces. Prior to law teaching, I practiced as a public defender in the Bronx and Manhattan from 1994 to 2005. I still maintain a part-time law practice as public defense counsel appointed under the Criminal Justice Act ("CJA") in the U.S. Court of Appeals for the Ninth Circuit. As part of this CJA practice, I represent clients *pro hac vice* as CJA counsel in the U.S. District Court for the Western District of Washington and the U.S. Supreme Court. I additionally have filed or participated in numerous *amicus* briefs in the U.S. Supreme Court, the Washington Supreme Court, and other tribunals. For example, I contributed to an *amicus* brief filed on behalf of Legal Ethics Professors and Practitioners in *Matter of Keenan*, 199 Wash.2d 87, 502 P.3d 1271 (Wa. 2022), a judicial ethics matter that first applied the 2011 Washington Code of Judicial Conduct (CJC).

6) Drawing on my academic and professional experience, I regularly consult with and train attorneys, law offices, and judges around the country on legal ethics issues. For example, I am scheduled to deliver legal ethics presentations this fall at the WSBA Solo and Small-Practice Section annual conference and the Washington Defender Association annual ethics conference. In 2024, I gave ethics presentations at several federal and state public defender offices, and I delivered a two-hour judicial ethics lecture at the Montana Judiciary's annual conference. My consultations include formal expert opinions, too. For instance, I am under retainer to testify as a legal ethics expert in an upcoming federal criminal trial.[3] I also have been requested to prepare a conflict of interest policy for a public defender office's homicide unit, and I recently prepared a declaration on judicial ethics in a state civil rights matter.

---

[3] This trial is not pending in the Western District of Washington.

**Opinion Summary & Relevant Facts**

7) Counsel have asked me to evaluate whether counsel's conduct in relation to the District Court's Order complied with counsel's professional responsibilities to the client, to the court, and to the opposing parties. My considered judgment is that counsel acted reasonably under all of the circumstances. These circumstances were imperfect, presented counsel with uncertainty in fulfilling conflicting responsibilities, and left the District Court with information gaps that "sapped substantial Court time—a finite resource." Order, at 1. The record I have reviewed, however, does not evidence a failure of candor by counsel, but rather lawyers navigating indeterminacy in duties to their client, including both the class representative and the class itself. Moreover, while navigating this rocky terrain, counsel maintained an appropriate degree of transparency about the lawyer-client relationship.

8) The record I reviewed in forming this opinion includes all of the communications between counsel and class representative Steven Floyd ("Floyd") that I understand the District Court had reviewed when it issued its Order. These communications appear in the Amended Floyd Communications Log at entries 2, 3, 5-11, 13-15, 20-25, 27-28, 30-33, 35, 37, 39, 41-46, 55, 56, 58, 60-61, 64-65, 68, 71-72, 75-76, 79, and 80. *See* Docket No. 174. I also reviewed a February 26, 2024, email from counsel to Floyd that I understand was not before the District Court for its September 29, 2025, Order. *See* Docket No. 174-38.

9) I further have reviewed the following publicly filed records, listed by entry number in the Clerk's Docket:

- Class Action Complaint. Docket No. 1.
- Plaintiffs' motion to amend complaint. Docket No. 80.
- Harrington declaration in support of motion to amend complaint. Docket No. 81.
- Defendants' opposition to Plaintiffs' motion to amend. Docket No. 86.
- Perry declaration in support of Plaintiffs' opposition. Docket No. 88.
- Plaintiffs' reply in support of motion to amend. Docket No. 92.

1

- District Court order granting motion to amend. Docket No. 98.

2

- Plaintiffs' opposition to motion to compel and cross-motion to withdraw class representative. Docket No. 114.

3

- Declaration in support of opposition to motion to compel and cross-motion to withdraw class representative. Docket No. 115.

4

- Plaintiffs' reply in support of cross-motion to withdraw class representative. Docket No. 127.

5

- District Court order granting motion to compel. Docket No. 132.

- Stipulated motion and order regarding Floyd discovery. Docket No. 135.

6

- Motion to withdraw as counsel. Docket No. 140.

7

- Harrington declaration in support of motion to withdraw. Docket No. 141.

- Plaintiffs' reply in support of motion to withdraw. Docket No. 149.

8

- Harrington declaration in support of reply to motion to withdraw. Docket No. 150.

- Defendants' motion for discovery sanctions. Docket No. 152.

9

- Liegel declaration in support of motion for discovery sanctions. Docket No. 153.

- Response to motion for discovery sanctions. Docket No. 156.

10

- Harrington declaration in support of response to motion for discovery sanctions. Docket No. 157.

11

- Defendants' reply in support of discovery sanctions. Docket No. 162.

12

- Defendants' motion to compel. Docket No. 172.

- Plaintiffs' opposition to motion to compel. Docket No. 176.

13

- Defendants' reply to motion to compel. Docket No. 180.

14

- District Court order on motion to compel. Docket No. 196.

- District Court order for disclosure of documents for *in camera* review. Docket No. 199.

15

- District Court order denying in part and granting in part discovery sanctions. Docket No. 203.

16

- Motion for attorney's fees and costs. Docket No. 208.

- Defendants' motion to reconsider order granting motion to amend. Docket No. 221.

17

- Plaintiffs' response to motion for attorney's fees and costs. Docket No. 223.

18

- Order granting unopposed motion for attorney's fees and costs. Docket No. 224.

- District Court's order to disclose documents for *in camera* review. Docket No. 234.

19

- District Court's September 29, 2025 Order granting reconsideration and dismissing this case. Docket No. 250.

20

1
2
3

10) I understand that counsel have submitted all attorney-client communications under seal for *in camera* review. This declaration thus will presume familiarity with the facts from those sealed materials and will not quote from them directly. The record, however, indicates the following procedural history that led to the District Court's Order:

4
5
6

This matter originated from a class action complaint filed on November 9, 2022. From this initiation of the matter to about January 11, 2024, counsel remained in contact with Floyd and had no apparent reason to anticipate that Floyd might withdraw as class representative. On January 16, 2024, Floyd responded to emails from counsel with negative reactions in the context of a discussion about the potential discovery obligations of a class representative.

7
8

Counsel did not hear from Floyd after the January 16, 2024, emails into February 2024. On February 1, 2024, counsel texted Floyd to confirm Floyd's status. On February 26, 2024, counsel emailed Floyd to confirm Floyd's status. Counsel did not receive responses to these communications.

9
10

While seeking to confirm Floyd's status, counsel located two additional class representatives in February 2024 and proposed an amended complaint adding the new class representatives to Defendants' counsel. Defendants opposed the amendment, and Plaintiffs moved to amend the complaint on February 29, 2024.

11

Counsel's declaration in support of the motion to amend disclosed several aspects of communications with Floyd since Floyd's last communication on January 16, 2024:

12
13
14

"Although Floyd has not affirmatively withdrawn as a class representative, his lapse in communication prompted class counsel to initiate a search for potential additional class representatives who could be added or (if necessary) substitute should Mr. Floyd fail to reengage."

15

"Class counsel informed counsel to Defendants that Mr. Floyd had 'become difficult to reach' and that class counsel was 'working diligently to determine whether Mr. Floyd wishes to continue serving as a class representative.'"

16
17
18

"[C]lass counsel has made several additional attempts to contact Mr. Floyd, but has not received a response. Mr. Floyd was notified that class counsel would be filing a motion to amend the pleadings to add additional class representatives, and invited to notify class counsel should he have any opposition to this course of action. Mr. Floyd did not respond."

19

On March 1, 2024, counsel again attempted to contact Floyd to confirm Floyd's status and update Floyd about the motion to amend. Floyd did not respond.

20

The District Court granted the motion to amend the complaint on May 6, 2024. In granting this motion, the District Court found that "[c]lass counsel diligently moved to substitute the new representatives after Floyd unexpectedly stopped communicating with them," and that "amendment permits this case to move forward after Floyd apparently lost interest in continuing to participate, which constitutes good cause for amendment." Docket No. 98, at 6-7.

In August 2024, counsel regained contact with Floyd. Counsel worked with Floyd again, but a short time later moved to withdraw after a conflict arose.

Defendants subsequently moved for discovery sanctions against Floyd because Plaintiffs had not complied with discovery obligations. The District Court ordered *in camera* review of certain communications between counsel and Floyd, including the January 16, 2024, email thread. The District Court denied sanctions against Floyd, finding that Floyd had sought to withdraw on January 16, 2024. The District Court instead sanctioned counsel with discovery attorney's fees and costs.

Defendant Apple also moved for reconsideration of the District Court's order granting Plaintiffs' motion to amend with new class representatives. The District Court ordered Plaintiffs' counsel to share additional communications with Floyd *in camera*. After reviewing these communications, the District Court on September 29, 2025, found that on January 16, 2024, "Floyd informed his counsel that he no longer wanted to participate in this litigation because he did not wish to participate in discovery, and reiterated that intention even after his counsel attempted to persuade him that the discovery process could be less onerous than he was assuming." Order, at 3. The District Court also found that counsel did not seek to clarify Floyd's status until after filing the motion to amend with new class representatives, and did not inform Floyd of this process. Order, at 12.

On this basis, the District Court granted Apple's motion for reconsideration, finding that, when moving to amend, Plaintiffs' counsel engaged in "misconduct" by "misrepresent[ing] their January 16 communications with Floyd to Defendants and the Court." The District Court consequently dismissed the case. Order, at 12-19.

**Analysis & Opinion**

11) Attorneys appearing before the District Court in the Western District of Washington must comply with the Washington Rules of Professional Conduct ("RPC"). *See* LCR 83.3(a)(2) (W.D.W.). Furthermore, in construing and applying all standards of conduct for attorneys:

> [T]he court may also consider the published decisions and formal and informal ethics opinions of the Washington State Bar Association, the Model Rules of Professional Conduct of the American Bar Association and Ethics Opinions issued pursuant to those Model Rules, and the decisional law of the state and federal courts.

LCR 83.3(a) (W.D.W.).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

12) The District Court's Order granted Defendant Apple's motion to reconsider and dismiss because the District Court found that Plaintiffs' counsel misrepresented Floyd's status as a class representative after Floyd's January 16, 2024, communications. According to the Order, Floyd on that date had "expressed a desire to withdraw from the litigation entirely and confirmed that intention shortly thereafter," Order, at 12, intending "to abandon the litigation entirely," Order, at 15, and counsel did not engage in due diligence with Floyd in the event counsel in good faith questioned Floyd's intentions. Order, at 11-12. As the Order illustrates, the District Court understandably was concerned with the delays and uncertainty about Floyd as a party in this matter. In declarant's respectful view, however, following Floyd's January 16, 2024, communications, counsel faced a classic predicament of "conflict between a lawyer's responsibilities to clients [and] to the legal system." Wa. RPC Preamble, ¶ 9. Counsel acted reasonably to fulfill both of these responsibilities.

13) Without doubt, if Floyd on January 16, 2024, had directed a new objective for counsel in the representation to withdraw Floyd from the case, counsel were obliged to honor this client objective. *See* Wa. RPC 1.2(a). Moreover, if Floyd by the same communications had "discharged" counsel, counsel were required to withdraw. *See* Wa. RPC 1.16(a)(3). Further, in moving to amend the complaint after January 16, 2024, to add new class representatives, counsel maintained a duty of candor to the tribunal. *See* WA. RPC 3.3(a)(1). Counsel also could not mislead the opposing party about material facts. *See* Wa. RPC 4.1(a).

14) Floyd's January 16, 2024, email communications did raise an issue for counsel about Floyd's intentions as a class representative in light of Floyd's discovery concerns. The record, however, indicates that Floyd's January 16 communications arose after this case had been pending for more than a year, during which time Floyd participated and communicated with counsel, including about discovery. The communications during this time period do not signal that Floyd was contemplating withdrawal. A lawyer's duty to a client is not to

DECLARATION                              -8-                    BROOKS HOLLAND

1  interpret isolated adverse communications from the client in favor of terminating both the

2  client's role as a party and the lawyer-client relationship at the expense of other reasonable

3  interpretations that could implicate significant client interests. *Cf.* Wa. RPC 1.16(d).

4  15) To the contrary, as courts have held, "'discharged,' as used in Rule 1.16, requires a client to

5  take some affirmative action to terminate a representation. It is not enough for a client to

6  impliedly discharge the lawyer; she must take some positive action to inform the lawyer that

7  her services are no longer desired." *AEG Investments, LP v. United States*, 147 Fed.Cl. 537,

8  538-39 (2020). Absent such affirmative discharge or client withdrawal, a lawyer after

9  accepting representation must pursue the client's objectives to the conclusion of

10  representation, *see* Wa. RPC 1.3, comment 4, and RPC 1.16, comment 1, and cannot

11  terminate the representation earlier without either ensuring that withdrawal will not

12  adversely affect the client's interests or demonstrating good cause. *See* WA. RPC 1.16(b).

13  Counsel also must obtain permission from a tribunal to withdraw, *see* Wa. RPC 1.16(c), and

14  must reasonably protect the client's interests on withdrawal, "such as [by] giving reasonable

15  notice to the client." Wa. RPC 1.16(d).

16  16) Following these principles, the court in *AEG Investments* refused to allow a lawyer to move

17  to dismiss an action on behalf of a client when the client had a prior retainer agreement with

18  another lawyer who had filed the action. *See id.* at 538. The court declined to recognize the

19  moving lawyer pending further information from the client even though the client had

20  emailed the moving attorney that she wanted that lawyer to represent her, had not been

responding to the other lawyer, and had filed a declaration professing representation by the

moving lawyer. *See id.* The court nevertheless required the client expressly to discharge prior

counsel, despite the inference that the client already had. *See id.* at 539.

17) The inference of termination by Floyd on January 16, 2024, was no stronger. Floyd expressed

strong reservations in an email discussion about potential discovery demands, even

DECLARATION                              -9-                              BROOKS HOLLAND

objection, but Floyd did not affirmatively withdraw from the litigation or discharge counsel. The language in these emails instead left counsel with uncertainty. Lawyers representing individual clients, particularly clients who are not experienced travelers in the legal system, often engage with clients who change their mind, sometimes repeatedly, due to frustration, uncertainty, fear, disappointment, embarrassment, or other sentiments about the legal process. In some cases, these sentiments could be consistent with a client seeking an exit strategy. Yet these sentiments also can reflect someone unprepared for the rigors of litigation who needs more time with counsel to understand the process and to calm nerves, or who instead desires a break from the stress of the case itself. Or someone who is experiencing other life events that make litigation or even communication unmanageable in the moment.

18) Lawyers thus need to interpret and act on adverse communications from clients in a holistic representational context, considering factors such as whether the statements are isolated or persistent over time, the client's other statements about the representation and prior involvement in decision-making, the status of the case, the client's familiarity with the relevant legal process, and any other factors relating to that client. Lawyers cannot expect every client to speak with the clarity, consistency, and certainty of a C-suite business client.

19) Here, Floyd emailed a potential pivot in reaction to onerous discovery demands when the case had been pending with Floyd's involvement as a named party for more than a year. This client dynamic is not rare, and counsel understandably wanted more information than this one email exchange to ensure counsel's actions accurately represented Floyd's agency as a party to this case with a long-standing lawyer-client relationship. *See* Wa. RPC 1.2(a), 1.4, and 2.1. For example, Floyd may have misperceived Defendants' discovery demands as an existing obligation, when counsel in fact could object to certain demands and request protective orders. Counsel's communications to Floyd after January 16, 2024, expressly reflected this concern that Floyd may have lacked full information.

DECLARATION                        -10-                        BROOKS HOLLAND

20) Adding to the uncertainty in this representation, Floyd abruptly ceased communication with counsel. Counsel cannot walk away from the lawyer-client relationship at the first sign the client may not return. Rather, the literature confirms that in the absence of an unambiguous discharge, lawyers must exercise due diligence to confirm the client's status and intent before inferring withdrawal or discharge from non-responsiveness. *See* Christine P. Deshler, Vanished! What To Do When a Client Goes Missing, Mass. Bd. of Bar Overseers, at 3 (2020) ("Vanished") (advising that "[o]nce the lawyer has made all reasonable efforts to locate the client and all possible extensions have been exhausted, at some point the lawyer must consider moving to withdraw if litigation is pending"); Allison E. Williams, *Missing Clients: What To Do When Your Client Has Vanished*, 28 J. Legal Prof. 247, 248-49, 256 (2004) (surveying sources, with required diligence defined as a "reasonable inquiry" to "everything possible"); *accord* Wa. Advisory Op'n 1864 (1999) (requiring "due diligence to locate the client prior to withdrawal"); Wa. Advisory Op'n 1796 (1998) (requiring lawyer to "make all reasonable efforts to contact the client and notify her of the status of the matter and the withdrawal"); A.B.A. Formal Ethics Op'n 1467 (1981); Ill. St. Bar Assoc'n Prof'l Conduct Advisory Op'n No. 03-04 (2004); *cf. e.g.*, *In re Valsartan Products Liability Litigation*, 2020 WL 955059, *2 (D.N.J. 2020) (denying motion to withdraw because it did not evidence that counsel had taken "all reasonable steps" to locate incommunicado client and notify the client of intent to withdraw).

21) If counsel had promptly withdrawn Floyd from the litigation in February 2024 without further efforts to clarify with and advise Floyd, counsel could have been exposed to liability. For example, class representatives have the opportunity to request incentive awards that are "fairly typical in class action cases" and are "generally sought after a settlement or verdict has been achieved." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009). Incentive awards are "intended to compensate class representatives for work done on behalf of the

class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Id.* Incentive awards vary in amount, but they can be significant and in some cases substantial. *See, e.g.*, *In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5158730, at *17 (N.D. Cal., Sept. 2, 2015) (discussing incentive awards of $20,000 and awarding one class representative $120,000 and others $80,000 each). Facing unexpected communications from Floyd on January 16, 2024, counsel needed to be diligent to clarify Floyd's objectives and ensure that Floyd pursued a course of action that was well-counseled and informed by independent professional judgment. *See* Wa. RPC 2.1 and comment 5. Indeed, Floyd did reengage in August 2024, and counsel would have been in a vulnerable position if they had terminated his role in February 2024 and did not have a meaningful record of diligent efforts to communicate with and advise Floyd about this decision.

22) In the absence of unambiguous information that Floyd had committed to leave this case altogether, counsel thus had a duty to maintain the *status quo* to guard the client's interests while pursuing more information. These actions necessarily included protection of confidential information, including information about the client's status, *see* Wa. RPC 1.6(a), and could include other actions such as non-frivolous motions. *See Vanished*, *supra*, at 1-2. The primary limitation in the literature is that a lawyer should not file a lawsuit that the client had not previously authorized in the client's absence. *See Vanished*, *supra*, at 2; *Missing Clients*, *supra*, at 249-54; *accord* A.B.A. Formal Ethics Op'n 1467 (1981); Ill. St. Bar Assoc'n Prof'l Conduct Advisory Op'n No. 03-04 (2004); *see* Wa. RPC 1.2(a). Here, from a single email thread on January 16, 2024, counsel reasonably sought to clarify Floyd's intentions before dropping Floyd altogether as the class representative in a class action lawsuit that had borne Floyd's party name for more than a year.

23) The *bona fides* of this judgment by counsel is reinforced by counsel's communications to Floyd on February 26, 2024, prior to the motion to amend, and on March 1, 2024.[4] These communications followed the script described in the cited literature addressing a non-responsive or potentially alienated client: Seek information on the client's status, advise the client of important case information, including potential replacement class representatives, and confirm whether the client wants to proceed. Nothing in these communications suggests that counsel was unfairly attempting to deter or delay Floyd from exercising his right to withdraw or to discharge counsel. *Contrast, e.g.*, *Cohen v. Radio-Electronics Officers Union, Dist. 3. NMEBA*, 679 A.2d 1188, 1197-1200 (N.J. 1996). Additional communications from counsel in May and June repeated these inquiries. A court in this context must be cautious in substituting its own *post hoc* judgment for counsel's real-time judgments about the status of a lawyer-client relationship, which will depend on holistic, confidential information that typically is not available to the court. *Cf. AEG Investments*, 147 Fed.Cl. at 538-39. That this information at a later time, with the benefit of hindsight, looks different to a court does not mean that counsel acted in bad faith in earlier moments of uncertainty.

24) In addition, while pursuing clarity about Floyd's status in February 2024, counsel had ethical duties to other individuals: the class itself in this action. The precise ethical relationship for class counsel between class representatives and the class itself is complex. *See generally* Nancy Moore, *Ethical Duties of Class Counsel Also Representing Class Representatives*, 72 Fla. L. Rev. Forum 160 (2022). But counsel could not subordinate the interests of the entire putative class to the uncertainty of whether Floyd wished to continue as class representative. *See Medical & Chiropractic, Inc. v. Oppenheim*, 981 F.3d 983, 990 (11th Cir. 2020).

---

[4] My understanding from counsel is that the District Court did not have the February 26, 2024, email before it when issuing the September 29, 2025, Order.

25) Counsel's action in moving to amend the complaint with two new class representatives harmonized counsel's duties to both Floyd and the class during uncertain conditions. Of course, in this process, counsel's "need to avoid disclosure of … potentially detrimental information does not give the lawyer license to *misinform* the court, opposing counsel, or anyone else concerning the client's whereabouts," and counsel "must also beware of those instances where the failure to make a disclosure may be the equivalent of an affirmative misrepresentation." *Vanished*, *supra*, at 2 (emphasis in original); *see also* Wa. RPC 3.3(a)(1) and comments 2-3. For example, the WSBA has previously opined that when a client in a divorce proceeding had ceased responding to counsel without completing the proposed dissolution, counsel had to inform the opposing party to ensure the other party was not misled about "his own marital status." Wa. Advisory Op'n 1796 (1998).

26) The record in this matter, however, does not indicate what counsel could have done to be more transparent short of submitting Floyd's actual communications to the District Court and opposing counsel to decide whether counsel still had a class representative. Counsel did represent that Floyd had not "affirmatively withdrawn" as a class representative on January 16, 2024, which counsel's efforts to communicate with Floyd, including on February 26, 2024, validate as good faith. Counsel's declaration, however, also candidly acknowledged that Floyd had become non-responsive, that counsel were uncertain of "whether Mr. Floyd wishes to continue serving as a class representative," and that counsel were pursuing more information. In the meantime, to protect the class's interests, counsel moved to amend with new class representatives. Defendants' response acknowledged these facts in opposing Plaintiffs' motion. The District Court's order also acknowledged counsel's disclosures, finding that "Floyd apparently lost interest in continuing to participate, which constitutes good cause for amendment." Docket No. 98, at 6-7. Any further disclosures from counsel would have taken procedural transparency to an open-file review, which ethics rules would

1    have forbidden except, for example, to prevent a crime or fraud by the client. *Compare* Wa.

2    RPC 1.6(a) with Wa. RPC 1.2(d) & 1.6(b)(2). Counsel for Defendants no more would

3    disclose the ups and downs of their consultations with their clients' constituents.

27) The District Court in its dismissal Order understandably was concerned with the

4    expenditure of time and resources that Floyd's uncertainty as a class representative

5    necessitated. Counsel operated with imperfect information from an unresponsive class

6    representative, which aggravated this procedural inefficiency. But counsel shared their

7    dilemma with the District Court and opposing counsel as much as ethics rules permitted

8    without disclosing Floyd's actual communications to debate whether they still had a class

9    representative. Declarant in no way countenances word games by counsel with a court. But

10    even without the benefit of counsel's February 26, 2024, email to Floyd, the District Court

11    acknowledged after reviewing Floyd's January 16, 2024, communications that "Floyd's

12    counsel were not entirely wrong" in hedging whether Floyd had disappeared for good,

13    because Floyd returned in August 2024. Docket Entry 203, at 6. By guarding against

14    unintended withdrawal by Floyd without more affirmative evidence while also disclosing

15    Floyd's uncertain status, counsel reasonably balanced their responsibilities and did not

16    violate the duty of candor. *Contrast e.g.*, *In re Ravin*, 29 Vet.App. 95, 103-106 (2017)

17    (upholding grievance when counsel's reply brief affirmatively denied existence of

18    administrative order and related appeal that would have deprived the court of jurisdiction).

19    These disclosure judgments can be extraordinarily difficult for counsel acting in real-time

20    with incomplete, isolated, and confidential information from lay clients.

28) Moreover, as the District Court's Order acknowledged, legal grounds permitted counsel to

    propose new class representatives within that window of time even if Floyd had withdrawn.

    In this context, the motive for counsel to misrepresent Floyd's status in bad faith is not

    apparent. *Contrast e.g.*, *Ravin*, 29 Vet.App. at 105; *contrast also In re Seelig*, 850 A.2d 477,

DECLARATION                    -15-                    BROOKS HOLLAND

484-92 (N.J. 2004) (holding that lawyer improperly failed to disclose during guilty plea that client had a prior record subjecting client to a mandatory minimum sentence higher than the plea agreement, but not disciplining the lawyer because the lawyer acted in "good faith" on a "novel" question). By contrast, counsel's ethical imperative was apparent for counsel to preserve Floyd's interests until counsel could give Floyd an affirmative opportunity to clarify his intentions—an imperative validated by counsel's February 26 and March 1 communications to Floyd, and Floyd's reengagement in August 2024.

29) Under all of these circumstances, declarant appreciates the District Court's concerns with the procedure in this matter and Floyd's uncertain status. Declarant, however, most respectfully could not characterize counsel's judgments and actions as misconduct. Rather, counsel sought to protect both named plaintiff and class interests, including confidentiality, in the face of this uncertainty while maintaining enough transparency to avoid substantive prejudice to the District Court and the opposing parties.

Respectfully submitted:
Dated: October 27, 2025

BROOKS HOLLAND
J. Donald & Va Lena Scarpelli Curran
Professor of Legal Ethics & Professionalism
Gonzaga University School of Law
Spokane, WA 99202
+1 509-313-6120 | hollandb@gonzaga.edu

DECLARATION                    -17-                    BROOKS HOLLAND